JAMES V. FITZGERALD, III (State Bar No. 55632)
NOAH G. BLECHMAN (State Bar No. 197167)
MCNAMARA, DODGE, NEY, BEATTY, SLATTERY,
PFALZER, BORGES & BROTHERS LLP
1211 Newell Avenue
Post Office Box 5288
Walnut Creek, CA 94596
Telephone: (925) 939-5330
Facsimile: (925) 939-0203

Attorneys for Defendants
COUNTY OF CONTRA COSTA, JOSHUA PATZER, and
WARREN RUPF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN DAY, individually and as successor in interest to the Estate of Steffen Matthew Day,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF CONTRA COSTA; JOSHUA PATZER; WARREN RUPF, and Does 1 through 50, et al.,<br><br>Defendants. | Case No. C07-4335 PJH<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION**<br><br>Date:     September 10, 2008<br>Time:     9:00 a.m.<br>Judge:    Hon. Phyllis J. Hamilton<br>Dept:     Courtroom 3, 17th Floor (SF) |

Defendants County of Contra Costa (hereafter "County"), Deputy Joshua Patzer (hereafter "Deputy Patzer"), and Sheriff Warren Rupf (hereafter "Sheriff Rupf"), (collectively "Defendants"), hereby file the following Motion for Summary Judgment, or in the alternative, Motion for Summary Adjudication, in this matter.

/ / /

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## Table of Contents

Page

I.    INTRODUCTION ........................................................................................... 1

II.   ISSUES TO BE DECIDED ........................................................................... 1

III.  RELEVANT FACTS ...................................................................................... 1

IV.   LEGAL ARGUMENTS.................................................................................. 12

    A.    Plaintiff's Claims ................................................................................. 12

    B.    Summary Judgment Standards.............................................................. 13

    C.    Defendant Deputy Patzer is Entitled to Qualified Immunity ................................. 14

        1.    Defendant Patzer Acted in an Objectively Reasonable Manner Under the 4th Amendment in His Use of Deadly Force ........................... 15

        2.    Even if the Court Finds a Triable Issue Relating to Whether or Not There Was A Constitutional Violation Under the 4th Amendment, the Defendant Officer Is Still Entitled to Qualified Immunity ................. 20

    D.    Defendant Deputy Patzer's Use of Deadly Force Did Not Violate the Plaintiff's 14th Amendment Rights for Maintaining a Parental Relationship ....... 22

    E.    Plaintiff Cannot Demonstrate Any *Monell* Related Claims.................................... 23

    F.    Plaintiff's Additional State Law Claims Also Fail as a Matter of Law ................. 24

        1.    Plaintiff's State Law Claims Fail As Defendant Patzer Acted in Accordance with the Fourth Amendment .................................... 24

        2.    Even if the Court Finds a Triable Issue With Regard to Any State Law Claims, Defendant Patzer Is Still Entitled to Immunity.................... 25

V.    CONCLUSION .............................................................................................. 25

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1

## Table of Authorities

2

Page(s)

3

**Cases**

4

Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991) ................................. 14

5

Billington v. Smith, 292 F.3d 1177 (9th Cir. 2002)................................................. 16, 20

6

Blanford v. Sacramento County, 406 F.3d 1110, 1119 (9th Cir. 2005)..................... 21, 22

7

Boyd v. City of San Francisco, U.S. Dist. LEXIS 33831 *2-6 (N.D. Cal. 2007).......... 21

8

Brosseau v. Haugen, 543 U.S. 194, 198 (2004)............................................... 14, 15, 21

9

Bull v. City & County of San Francisco, 2006 U.S. Dist. LEXIS 9120, * 46 (N.D. Cal. 2006) ...18

10

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ........................................ 13, 14

11

City of Canton v. Harris, 489 U.S. 378, 390-391 (1989)........................................ 24

12

Crabtree v. Hair, 2007 U.S. Dist. LEXIS 82502, *26-26 (N.D. Okl.. 2007)................. 18

13

Crowe v. County of San Diego, 359 F.Supp.2d 994, 1039 (S.D. Cal. 2005) .......... 22, 23

14

David v. City of Fremont, 2006 U.S. Dist. LEXIS 57211, *47-49 (N.D. Cal. 2006)........ 15, 21

15

Edson v. City of Anaheim (1998) 63 Cal.App.4[th] 1269, 1273-74 .......................... 15, 24

16

Eisenberg v. Insurance Co. of North America, 815 F.2d 1285, 1288-89 (9th Cir. 1987)........ 13

17

Forrett v. Richardson, 112 F.3d 416, 421 (9th Cir. 1997)...................................... 17, 23

18

Gausvik v. Perez, 392 F.3d 1006, 1008 (9th Cir. 2004) ....................................... 23

19

Graham v. Connor, 490 U.S. 386, 388 (1989) ......................................... 12, 15, 16, 19

20

Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001) ............................... 22

21

Lujan v. National Wildlife Federation, 497 U.S. 871, 885 (1990) ........................... 14

22

Martinez v. County of Los Angeles (1996) 47 Cal.App.4[th] 334, 343-344.................. 15, 24

23

McCorkle v. Los Angeles, (1969) 70 Cal. 2d 252, 261 ...................................... 25

24

Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994) ............................... 16

25

Monell v. New York Department of Social Services, 436 U.S. 658, 690-691 (1978) .. 1, 12, 23, 24

26

Parks v. Pomeroy, 387 F.3d 949, 956-958 (8th Cir. 2004) .................................. 18

27

People v. Rivera, (1992) 8 Cal.App.4[th] 1000, 1007 ......................................... 25

28

Plakas v. Drinski, 19 F.3d 1143, 1148 (7th Cir. 1994) ....................................... 16

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

**Table of Authorities**
(Continued)

Page(s)

Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996)....................................... 23

Robinson v. Solano County, (9th Cir. 2002) 278 F.3d 1007, 1016 ..................................... 25

Romero v. Bd. Of County Comm'rs of the County of Lake, Colorado, 60 F.3d 702 (10th Cir. 1995) ........................................................................................................................................ 17

Saucier v. Katz, 533 U.S. 194, 206 (2001) ............................................... 14, 15, 21, 22

Schaefer v. Goch, 153 F.3d 793, 799 (7th Cir. 1998) ..................................................... 23

Scott v. Harris, 127 S.Ct 1769, 1777 (2007) ................................................................... 16

Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994)......................................................... 23

Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992) ..................................................... 16

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)....... 13

Tennessee v. Garner, 471 U.S. 1, 8–9 (1985) ........................................................... 15, 16

Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004)................................................. 22

Tom v. Voida, 963 F.2d 952 (7th Cir. 1992) ............................................................. 18, 20

United States ex rel. Anderson v. N. Telecom, Inc., 52 F.3d 810, 815 (9th Cir. 1995)................. 14

**Statutes**

42 U.S.C. § 1983 ................................................................................................ 12, 22, 23

California Civil Code § 52.1 ................................................................................................. 12

California Government Code ("GC") § 820.2 ...................................................................... 25

FRCP 56.................................................................................................................................. 13

GC § 815.2 ............................................................................................................................. 25

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## I. **INTRODUCTION**

This lawsuit arises out of an unfortunate incident where Decedent Steffen Day (hereafter "Decedent") fled from officers during a brief detention, then fought violently with Deputy Patzer to the point where Decedent was winning the fight, forcing Deputy Patzer to fire one gunshot at Decedent in self defense, fatally wounding Decedent. As can be seen below, Decedent, who was severely intoxicated on methamphetamines, escalated this situation to the point where Deputy Patzer had to use deadly force to stop Decedent's aggression and to protect the Deputy's own life. The only living witness to this shooting incident is Deputy Patzer. All in all, per the undisputed facts as demonstrated below, Deputy Patzer's actions comported with all constitutional requirements and Plaintiff cannot create any genuine and material factual issues to defeat this motion. Defendants are entitled to summary judgment.

## II. **ISSUES TO BE DECIDED**

1)    Whether Defendant Patzer is entitled to qualified immunity?

(a)    Whether Defendant Patzer's conduct in firing at Decedent violated Decedent's rights under the 4th Amendment?[1]

(b)    If there is found to be any triable issue of a material fact under the 4th Amendment claim, whether Defendant Patzer is entitled to qualified immunity as the right was not clearly established or whether a reasonable officer could have believed his conduct was lawful?

2)    Whether Plaintiff can prove a 14th Amendment violation for interference with a parental relationship?

3)    Whether Plaintiff can provide any evidence to support his *Monell* claim?

4)    Whether any of Plaintiff's state law claims can survive and/or are subject to state law immunities?

## III. **RELEVANT FACTS**

On August 15, 2006, at approximately 1:45 a.m., Deputy Patzer was in a full Contra Costa

---

[1] Plaintiff is not contesting whether or not Defendants had reasonable suspicion to detain Decedent. Rather, Plaintiff only contends the force used on Decedent's was excessive and unreasonable per the 4th Amendment.

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

County Sheriff's Office ("SO") uniform, driving in a marked SO patrol car performing patrol work with Deputy Vorhauer ("Deputy Vorhauer"), his partner on that date, also in full uniform, in the Bay Point area of Contra Costa County. (See **Exhibit A**, Declaration of Patzer ("Patzer Decl.") ¶ 3; **Exhibit B**, Declaration of Vorhauer ("Vorhauer Decl.") ¶ 3).[2] Deputy Patzer had been with the SO since 2000 following his graduation from the police academy and had been working the streets in the patrol division since approximately 2003. Since 2004, he had been involved with the SWAT and sniper teams and has consistently qualified twice a year for firearms training via the SO. (Patzer Decl. ¶¶ 1-2). Deputy Vorhauer had been with the SO since August of 2000, since he graduated from the police academy. Deputy Vorhauer had been a patrol officer with the SO for two plus years and since December of 2007, is a detective. (Vorhauer Decl. ¶¶ 1-2). Since the police academy, both deputies have attended annual advanced officers' training with the SO. (Patzer Decl. ¶ 2; Vorhauer Decl. ¶ 2).

During their late night patrol, the deputies noticed two vehicles, a pickup truck and a black Mustang ("Mustang"), driving erratically and tailgating each other on the roadway. (Patzer Decl. ¶ 3; Vorhauer Decl. ¶ 3). The deputies got behind the two vehicles to observe their further driving behavior. The vehicles continued to drive erratically. (Patzer Decl. ¶¶ 4, 6; Vorhauer Decl. ¶¶ 4,6). Deputy Vorhauer was driving while Deputy Patzer was in the passenger seat, attempting to run the license plates of the involved vehicles. (Patzer Decl. ¶ 5; Vorhauer Decl. ¶ 5). The truck started to drive lawfully, though the Mustang continued to drive erratically and actually sped up. The deputies followed the Mustang while they attempted to run its license plate. (Patzer Decl. ¶¶ 7-9; Vorhauer Decl. ¶¶ 7-9).

While following the vehicle, the Mustang stopped briefly and the deputies could see that the trunk of the Mustang had an apparent punched lock which was indicative of a stolen vehicle. A punched lock is a common criminal technique used for car thefts. (Patzer Decl. ¶¶ 10-11; Vorhauer Decl. ¶¶ 10-11). At that point, the deputies believed the vehicle may have been stolen so Deputy Patzer continued looking on the computer to see if he could confirm the vehicle's status so the two deputies could develop a strategy if they were going to perform a felony traffic

[2] All exhibits referenced herein are attached hereto to the Declaration of James V. Fitzgerald, III, Esq.

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

stop. (Patzer Decl. ¶ 12; Vorhauer Decl. ¶ 12). The Mustang vehicle then continued to flee and drive on. (Id.).

Before being able to confirm via computer whether or not the vehicle was listed as stolen or other pertinent information, the Mustang pulled left into a driveway. (Patzer Decl. ¶ 13; Vorhauer Decl. ¶ 13). At that point, the deputies stopped their vehicle and activated both of their side spotlights to illuminate the Mustang as it was very dark. (Id.). After illuminating the Mustang, the deputies saw furtive movements inside of the vehicle by the three occupants. More specifically, the front two passengers appeared to be handing items to the passenger in the back seat from the floorboard areas. This is common behavior by suspects who are trying to either hide or obtain weapons or contraband. (Patzer Decl. ¶ 14; Vorhauer Decl. ¶ 14). At that point, the deputies quickly exited their patrol vehicle to approach the Mustang. Deputy Vorhauer approached on the driver's side of the vehicle, with his flashlight in hand, while Deputy Patzer approached on the passenger side, also with his flashlight in hand. (Patzer Decl. ¶ 15; Vorhauer Decl. ¶ 15). As he approached, Deputy Vorhauer could see broken glass on the floorboard of the vehicle and a punch tool in the center console which is a tool commonly used by car thieves to break windows. (Vorhauer Decl. ¶ 16). Deputy Patzer could see that the ignition looked to have been punched and there was no key in the ignition on the steering column, facts he communicated to his partner. (Patzer Decl. ¶ 16; Vorhauer Decl. ¶ 17). These were all objective signs that this vehicle was likely a stolen vehicle.

Due to the immediate safety issues for this likely felony encounter involving a stolen vehicle, Deputy Patzer pulled out his duty weapon and held it in the low ready position behind his leg. (Patzer Decl. ¶ 17). The front passenger of the Mustang attempted to open the door so Deputy Patzer was forced to shut the door to keep the occupants inside of the vehicle. (Patzer Decl. ¶ 18). Deputy Patzer then ordered the front passenger to place his hands on the dashboard and the back passenger to put his hands on the headrest. (Patzer Decl. ¶ 19). The occupants were not complying with Deputy Patzer's orders to keep their hands in plain sight. The passenger in the backseat continued to move. Eventually, the passengers complied with placing their hands at the appropriate locations where Deputy Patzer could see them. (Patzer Decl. ¶¶ 20-21).

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    During this same time, Deputy Vorhauer was attempting to get the driver (which turned

2    out to be Decedent) out of the vehicle so he could put Decedent in a position to search him for

3    weapons.  Decedent could not turn the Mustang engine off when the deputies ordered him to do

4    so and the vehicle remained idling.  This was further evidence to the deputies that this vehicle

5    may have been stolen and then hot-wired to drive without a key.  (Vorhauer Decl. ¶¶ 18-20;

6    Patzer Decl. ¶¶ 22-23).  As he did not want Decedent to be able to get back into the idling

7    vehicle, Deputy Vorhauer asked Decedent to step around the driver's side door and directed him

8    towards the front left panel of the vehicle so he could search him for weapons.  (Vorhauer Decl.

9    ¶¶ 19-20).  Decedent then stepped around the driver's side door while Deputy Vorhauer followed

10   him towards the front of the car.  (Vorhauer Decl. ¶ 21).

11   At the same time period, the rear passenger again dropped his hands from the headrest and

12   Deputy Patzer could not see the person's hands which was an obvious officer safety issue.

13   (Patzer Decl. ¶ 24).  As Deputy Patzer was again ordering the backseat passenger to place his

14   hands back on the headrest, Deputy Patzer saw Decedent flee and start running across the front of

15   the Mustang, between the front of the Mustang and the garage door of the house, past Patzer's

16   direction.  (Patzer Decl. ¶ 25; Vorhauer Decl. ¶ 22).  Deputy Patzer looked back towards the

17   Mustang and saw that the front passenger was again trying to open the car door so Deputy Patzer

18   used his foot to kick the door shut to keep the passengers in the vehicle.  (Patzer Decl. ¶ 26).

19   Deputy Patzer then put his duty weapon back into his holster and chased the Decedent because

20   Deputy Patzer was now closer to the fleeing Decedent then Deputy Vorhauer.  (Patzer Decl. ¶

21   27).  Deputy Patzer told Deputy Vorhauer that he was proceeding with a "foot pursuit" of the

22   fleeing driver Decedent.  (Patzer Decl. ¶ 27; Vorhauer Decl. ¶ 23).

23   Deputy Vorhauer was not able complete any pat search of Decedent so Deputy Patzer did

24   not know whether or not Decedent had any weapons on him, like a gun or a knife, when Decedent

25   fled.  (Patzer Decl. ¶ 28; Vorhauer Decl. ¶ 24).  After Decedent ran from the scene, Deputy

26   Vorhauer stayed with the other two passengers in the vehicle for officer safety reasons.

27   (Vorhauer Decl. ¶ 25).

28   During the foot pursuit, Decedent jumped the wall between that home from where he fled

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

and the home next door and Deputy Patzer could see Decedent fall after jumping over the wall. (Patzer Decl. ¶ 29). Deputy Patzer then jumped on top of the wall, watched Decedent run off and then jumped down to continue to pursue him. (Patzer Decl. ¶ 30). After Deputy Patzer jumped over the wall, he pulled his flashlight out and shined it in the area where he was located which was very dark. (Patzer Decl. ¶ 31). Deputy Patzer shined his flashlight towards <u>Decedent who was attempting to get into the front door of the nearby residence</u>. (Patzer Decl. ¶ 32). Deputy Patzer did not know if Decedent knew the people in that residence or if he was just continuing in his attempt to flee. (Patzer Decl. ¶ 33).

Deputy Patzer then continued to chase Decedent back out onto the street as Decedent moved one more house down the street. (Patzer Decl. ¶ 34). Deputy Patzer loudly yelled to Decedent to "stop, Sheriff's Office, police, stop," or words to that effect, several times during the foot pursuit, but Decedent continued to run and flee, ignoring his orders. (Patzer Decl. ¶ 35).

As Deputy Patzer chased Decedent to the house next door, Decedent ran towards the front door of that residence. At the last second, Decedent turned towards his right and jumped on the nearby fence. As Decedent jumped on the fence, Deputy Patzer caught up to Decedent and grabbed Decedent's shoulders to pull him back down towards him to control and handcuff him. (Patzer Decl. ¶ 36). The fence turned out to be a gate and the gate gave way and opened, causing Deputy Patzer to fall forward to the ground on his knees and drop his flashlight. At that point, <u>there was no ambient light in this side yard area and one could only see by flashlight in this area, though Deputy Patzer had dropped his flashlight when he fell.</u> (Patzer Decl. ¶ 37). Decedent and Deputy Patzer were in a very narrow side yard area next to a house. <u>There was also significant debris and garbage in this narrow area.</u> (Patzer Decl. ¶ 38).

As Deputy Patzer was attempting to stand back up and to locate his flashlight, he was hit in the face by Decedent, which felt like a fist punch to the left side of his head, which caused him to stumble backwards <u>and dazed him</u>. (Patzer Decl. ¶ 39). Deputy Patzer had a hard time seeing as the area was very dark and he had dropped his flashlight which now was located under the debris in this narrow area. (<u>Id</u>.).

Deputy Patzer went to grab Decedent to prevent him from continuing to run and instead of

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1   grabbing Decedent's back, as Deputy Patzer had anticipated if Decedent was indeed attempting to

2   further flee, Deputy Patzer grabbed Decedent's shoulders as Decedent was facing Deputy Patzer.

3   Deputy Patzer could now feel Decedent continuing to punch and take swings at him in a

4   threatening manner. (Patzer Decl. ¶ 40). Deputy Patzer ducked his head between his arms to

5   prevent Decedent from hitting him square in the face or head area at which point Deputy Patzer

6   started to be pushed backwards by Decedent. <u>Some of Decedent's blows were making contact</u>

7   <u>with Deputy Patzer on the side of his head, the top of his head and in his shoulder areas.</u> (Patzer

8   Decl. ¶ 41). Deputy Patzer then pushed Decedent away from him thinking that this would give

9   Decedent time to run away and would stop his assault and battery on Deputy Patzer. At this point

10  in time, Deputy Patzer was on uneven ground, he was slipping around on the debris on the ground

11  and he could not gain any solid leverage or balance. (Patzer Decl. ¶ 42).

12  As Deputy Patzer regained his balance, Decedent was again forcing himself on Deputy

13  Patzer, causing the Deputy to fall down in a pile of debris and garbage that was on the ground in

14  this narrow side yard of the house where the two were located. (Patzer Decl. ¶ 43). It was so

15  dark in that side yard area during the struggle that <u>Deputy Patzer could only really see a silhouette</u>

16  <u>of Decedent</u> and could not specifically see Decedent's hands or if Decedent had any weapons in

17  his hands or in his waistband. (Patzer Decl. ¶ 44). When Deputy Patzer had fallen back down to

18  the ground, his right arm went through the pile of trash and he held his left arm up to try to

19  protect himself from Decedent who was now essentially on top of him and aggressively swinging

20  at Deputy Patzer. Decedent was once again hovering over Deputy Patzer at this point, Decedent

21  was in the position of advantage and his punches were making contact with Deputy Patzer's

22  body. (Patzer Decl. ¶ 45).

23  Deputy Patzer used his legs to push off the ground and to get up again. As he was getting

24  up, Deputy Patzer expected Decedent to just run away and that was okay with Deputy Patzer as

25  Decedent had been on top of him twice, had been overpowering the Deputy and <u>Deputy Patzer</u>

26  <u>was still dazed from the initial punch to the face</u>. Deputy Patzer was willing to let Decedent run

27  away to get Decedent away from him at that time to stop Decedent's violent assault in this narrow

28  and very dark area. (Patzer Decl. ¶ 46). Instead of fleeing, Decedent came at Deputy Patzer

1    again swinging at Deputy Patzer in an aggressive manner. Deputy Patzer put his left arm up to

2    protect himself from Decedent's assault and put his other hand on his duty weapon. (Patzer Decl.

3    ¶ 47).

4         As Deputy Patzer was being pushed back, something hit Deputy Patzer from behind in the

5    middle of his back which he believed could have been an ambush from either the other

6    passengers in the Mustang or friends of Decedent that came from a nearby house where they were

7    located to join in on the assault and battery on Deputy Patzer. (Patzer Decl. ¶ 48). Decedent

8    continued to use aggression towards Deputy Patzer causing him to again lose his footing.

9    Decedent was now on top of Deputy Patzer for the third time, was pushing the Deputy backwards

10   and continually punching and hitting him. (Patzer Decl. ¶ 49). During that process, Deputy

11   Patzer had grabbed his duty weapon, tried to step back and bend down a little bit and fired one

12   gunshot at the direction of Decedent with his arm bent backwards, close to his body and away

13   from Decedent, in what is known in the law enforcement field as the "retention position." This

14   retention position is used by officers in situations when they are being assaulted and/or to prevent

15   a suspect from grabbing the officer's gun. (Patzer Decl. ¶ 50). Deputy Patzer did not have a taser

16   on him at the time of the incident. Also, he could not use a baton or pepper spray due to the close

17   proximity of Decedent to him and the severity and constant rapid barrage of aggression from

18   Decedent, forcing Deputy Patzer to defend his life. (Id.).

19        Deputy Patzer saw the muzzle of the gun flash as it was very dark in that area which had

20   no ambient lighting. The force of the gunshot made Deputy Patzer's foot slip out on the ground

21   so he had to again regain his balance. (Patzer Decl. ¶ 51). Immediately after the gunshot, the

22   force on Deputy Patzer by Decedent had stopped, the Deputy's arm then went straight out with

23   the gun towards the area of Decedent and it appeared at first that Decedent may had run off as

24   Deputy Patzer could not feel him nearby. (Patzer Decl. ¶ 52). Deputy Patzer could see his

25   flashlight down and to his left underneath the debris so he kicked the garbage away and picked up

26   his flashlight. Deputy Patzer immediately shined the light behind him to see who or what was

27   behind him and saw that there was nothing behind him except for an external square air

28   conditioner unit in the window of the house. (Patzer Decl. ¶ 53).

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1   Deputy Patzer then shined the flashlight in front of him and noticed Decedent on the

2   ground attempting to get up. Deputy Patzer again yelled "Sheriff's Office, stay on the ground,

3   don't get up" or words to that effect. (Patzer Decl. ¶ 54). At this time, Deputy Patzer had his

4   duty weapon and flashlight out and both were pointed at Decedent. Deputy Patzer was physically

5   exhausted at this point due to the significant struggle with Decedent. (Patzer Decl. ¶ 55).

6   As Decedent was attempting to get up, Deputy Patzer could see that he was bleeding.

7   Deputy Patzer then got onto his radio and immediately asked for a Code 3 cover, meaning asking

8   other officers to come to the scene urgently with lights and sirens to assist, and he also asked

9   dispatch to send fire and ambulance for Decedent. Deputy Patzer also informed dispatch that

10  shots had been fired and the suspect was down. Deputy Patzer informed dispatch of his location

11  as he could see the number of the house across the street. (Patzer Decl. ¶ 56). At that point,

12  Deputy Patzer was unsure of what Deputy Vorhauer was doing with regard to the other two

13  passengers of the Mustang, whether the passengers were armed, fighting with the officer or

14  fleeing. (Patzer Decl. ¶ 57). Soon thereafter, other officers arrived on the scene and Deputy

15  Patzer was quickly sequestered away from the side yard area and into a SO patrol vehicle while

16  the other officers took control of the scene. (Patzer Decl. ¶ 58). Before Deputy Patzer was

17  sequestered, he assisted in moving some of the garbage out of the way so the gate could be fully

18  opened and there could be a path through the gate for medical staff and other officers. It was

19  apparent to Deputy Patzer that the side yard area gate was not meant to be opened as it appeared

20  that garbage and debris had accumulated for a long period of time behind that gate. (Id).

21  From Deputy Vorhauer's perspective, approximately 30-40 seconds after Decedent ran

22  from the scene, he heard a single gunshot nearby. (Vorhauer Decl. ¶ 26). Deputy Vorhauer then

23  pulled out his firearm and pointed it at the two passengers in the Mustang as he did not know the

24  circumstances surrounding the single gunshot. (Vorhauer Decl. ¶ 27). Deputy Vorhauer waited

25  to hear from Deputy Patzer as to what was going on and shortly thereafter, Deputy Patzer

26  broadcasted over the radio that shots had been fired, the suspect was down and Deputy Patzer was

27  requesting Code 3 cover and for dispatch to send Code 3 fire and ambulance to the scene.

28  (Vorhauer Decl. ¶ 28).

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    Once the other passengers in the Mustang were safety handcuffed, Deputy Vorhauer

2    located Deputy Patzer and asked him what happened. Deputy Patzer stated to Deputy Vorhauer

3    something to the effect of that the guy (Decedent) was on top of him and had hit him (Deputy

4    Patzer). (Vorhauer Decl. ¶ 29). <u>Deputy Vorhauer could see a large fresh bump/knot injury on the</u>

5    <u>left side of Deputy Patzer's forehead.</u> (Vorhauer Decl. ¶ 30). Soon thereafter, like Deputy Patzer,

6    Deputy Vorhauer was quickly sequestered away from the scene and into a Sheriff's Office patrol

7    vehicle. (Vorhauer Decl. ¶ 31).

8    During the time when Deputy Patzer was pursuing Decedent, on at least five to seven

9    occasions, Deputy Patzer stated to Decedent that he was "Sheriff's Office, stop running," and

10    Sheriff's Office, stop resisting" or words to that effect. (Patzer Decl. ¶ 59). In retrospect, the

11    item that hit Deputy Patzer in the back when he was in the side yard defending himself from

12    Decedent's assault and battery was apparently the external square air conditioner unit in the

13    window. (Patzer Decl. ¶ 60). After he was sequestered, Deputy Patzer became aware of the

14    injuries he suffered in this altercation, including knots on his forehead and head, scrapes on his

15    hands, arms and knees. Deputy Patzer's uniform was also damaged in the knee area and he had

16    lost buttons off his shirt from the violence by Decedent. (Patzer Decl. ¶ 61).

17    At the time that Deputy Patzer intentionally fired one gunshot at Decedent, Deputy Patzer

18    firmly believed that Decedent was going to get on top of him again, would perhaps overpower

19    him and obtain his weapon and shoot him. At that moment, Deputy Patzer believed his life was

20    in immediate danger so he defended his life by shooting at Decedent to stop Decedent's violent

21    assault and battery. Decedent was very strong during this struggle and was overpowering Deputy

22    Patzer up until the point when Deputy Patzer fired at Decedent. (Patzer Decl. ¶ 62). Deputy

23    Patzer did not fire his weapon at Decedent accidentally. (Patzer Decl. ¶ 63).

24    On more than one occasion, Decedent had the opportunity to stop resisting, to retreat

25    and/or to flee out of the side yard area of the house during the struggle, but instead chose to

26    continue threatening Deputy Patzer with assault and battery and endangering Deputy Patzer's life.

27    (Patzer Decl. ¶ 64). <u>At no point did Decedent ever stop resisting.</u> (Patzer Decl. ¶ 65).

28    <u>From the time when Decedent started struggling with Deputy Patzer in the side yard after</u>

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    they both went over the fence to the time when Deputy Patzer fired his weapon at Decedent was a

2    time period of approximately 15-20 seconds. (Patzer Decl. ¶ 66). Deputy Patzer is aware that

3    Decedent died as a result of the gunshot wound. (Patzer Decl. ¶ 67). Deputy Patzer is also aware

4    that a significant amount of methamphetamine was found in Decedent's system. (Patzer Decl. ¶

5    68). A methamphetamine cutting substance was also found in the pants pocket of Decedent.

6    (Pazter Decl. ¶ 69). Also, Decedent did not have a California driver's license though he was

7    driving the Mustang. (Pazter Decl. ¶ 70). Overall, from the time the deputies stopped their patrol

8    car and got out of the car due to the Mustang occupants' dangerous furtive movements to the time

9    when Deputy Patzer broadcasted that a gunshot had been fired, was a **period of approximately**

10   **two minutes**. (Patzer Decl. ¶ 71; Vorhauer Decl. ¶ 32).

11        Decedent was taken to the hospital in an ambulance and died shortly after arriving at the

12   hospital. (See **Exhibit C**, Complaint for Damages ¶ 21). Dr. Peterson performed the autopsy on

13   Decedent. (See **Exhibit D**, Declaration of Dr. Peterson ("Peterson Decl.") ¶ 1-3). The cause of

14   death was internal bleeding due to the gunshot wound. (Peterson Decl. ¶ 6). The bullet came

15   through the front of Decedent's body, went through his abdominal wall and severed a key artery,

16   then lodged in his pelvis. (Peterson Decl. ¶ 5). At the time of his death, Decedent was

17   approximately five foot eleven inches tall and weighed 178.5 pounds. (Peterson Decl. ¶ 4). On

18   the date of the incident, Deputy Patzer was five feet eleven inches tall and weighed approximately

19   180-190 pounds. (Patzer Decl. ¶ 79). Upon external examination, Dr. Peterson found fresh

20   scratches on the back of Decedent's right hand which were consistent with Decedent being in a

21   struggle and punching. Dr. Peterson also found a fresh abrasion in the middle of Decedent's

22   forehead that was a brush-type abrasion and a fresh abrasion on Decedent's chest that was

23   reminiscent and matched a pattern of contact with a fence. (Peterson Decl. ¶ 7).

24        Per Dr. Peterson's request, Decedent's blood was tested for toxicological results. In terms

25   of toxicology, a significant amount (0.55 micrograms per ml.) of methamphetamine was detected

26   in Decedent's system at the time of his death. (Peterson Decl. ¶ 8; see also **Exhibit E,**

27   Toxicology Report). It is generally accepted in the medical community that a methamphetamine

28   level higher than 0.50 is deemed a lethal level and Decedent's level was above that lethal level.

1   (Peterson Decl. ¶ 9). It is also very likely that Decedent had a higher level of methamphetamine

2   in his system at the time of the shooting incident which was then diluted during the introduction

3   of intravenous fluids for Decedent's emergency medical treatment. (Id. at ¶ 10). Also, Decedent

4   had an amphetamine level of 0.04 micrograms per ml. which means that only a small amount of

5   methamphetamine was metabolized, indicating that Decedent had used methamphetamine

6   recently before his death. Succinctly stated, a large, potentially lethal, and recent dose of

7   methamphetamine was found in Decedent's system at the time of his death. (Id. at ¶¶ 11-12).

8       Following this incident, photographs were taken of the involved Mustang, the scene of the

9   incident and Patzer's injuries. (See **Exhibit F**, Declaration of Alex Taflya with Photographs of

10   Mustang and Scene; **Exhibit G**, Photographs of Patzer's Injuries (authenticated per Patzer's Decl.

11   ¶¶ 72-73)). In addition, a video was taken of the coned path of travel of Decedent and Patzer

12   from the Mustang to the area of the shooting, as well as aerial photographs of the same. (See

13   **Exhibit H**, Video of Coned Path of Travel of Decedent and Patzer and Aerial Photographs of

14   Coned Path (authenticated per Patzer's Decl. ¶¶ 74-78)). This evidence strongly corroborates

15   Defendants arguments in this motion.

16       The facts of the methamphetamine in Decedent's system, the cutting agent in his pants,

17   the fact that he had no driver's license, and was driving a potentially stolen vehicle were all

18   factors that perhaps explain Decedent's flight and significant struggle to prevent Deputy Patzer

19   from arresting him for those crimes. Overall, Decedent had several opportunities to stop resisting

20   and/or stop further flight from Deputy Patzer during the struggle, but instead chose to stay and

21   violently attack Deputy Patzer. Deputy Patzer was never able to gain the upper hand in the

22   struggle and Decedent's drug intoxication caused him to act aggressively, with increased strength,

23   and violently towards Deputy Patzer. At the critical moment, Deputy Patzer was in fear of his life

24   and used deadly force to stop Decedent's fierce attack and to defend himself. Deadly force was

25   justified under the circumstances facing Deputy Patzer and Deputy Patzer's actions were lawful,

26   constitutional and entitle him and the other Defendants to summary judgment.

27

28   / / /

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## IV. <u>LEGAL ARGUMENTS</u>

### A. <u>Plaintiff's Claims</u>

On August 22, 2007, Plaintiff Shawn Day, Decedent's father, filed suit for civil rights and wrongful death in this Court. In his Complaint, Plaintiff alleges the following claims for relief (See Exhibit C).

(1)    § 1983 claim for excessive force via the 4th Amendment versus Defendant Patzer;

(2)    § 1983 claim for violation of parental relationship, an interest protected by the 14th Amendment versus Defendant Patzer;

(3)    *Monell* claim versus Defendant Sheriff Rupf;

(4)    Wrongful death (negligence) versus all Defendants;

(5)    Violation of California Civil Code § 52.1, interference with Decedent's rights per the 4th Amendment and California Constitution per threats, intimidation and coercion versus Defendants Patzer and the County of Contra Costa.

In discovery, Defendants requested that Plaintiff admit that " Deputy Patzer's shooting of Decedent Steffen Day was objectively reasonable within the meaning of <u>Graham v. Connor</u>." (See **Exhibit I**, Defendant Patzer's Request for Admission, Set One, to Plaintiff, along with Plaintiff's Response to Defendant Patzer's Request for Admission) If Plaintiff's response was anything other than an unqualified admission, Plaintiff was charged with responding to special interrogatories stating all facts, witnesses and documents supporting such a position. In response (See **Exhibit J**, Plaintiff's Supplemental Response to Deputy Patzer's Special Interrogatories, Set One, No.'s 1-3), Plaintiff denied the request for admission and stated eight facts that Plaintiff contends supports its denial and consequently his facts in support of his liability claims.

1.  Defendant Patzer was a much larger man that (sic) the defendant as evidenced by records produced by defendant.

2.  Defendant Patzer did not use or reasonably attempt to use less than lethal force to arrest the decedent.

3.  Defendant made conflicting statements as to whether or not the decedent attempted to take control of his weapon.

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

4.  Decedent was unarmed.

5.  No evidence that Patzer knew that decedent was under the influence of a drug.

6.  No evidence that Patzer believed decedent was a violent person or had committed prior acts of violence.

7.  The short time between Patzer giving chase to decedent and the time of the shooting indicates no time sufficient for the kind of physical altercation between decedent and Patzer as claimed by Patzer.

8.  Neighbors did not see or hear any fights between Patzer and the decedent.

Plaintiff only identified as witnesses the witnesses in the police report and in the transcript of the Coroner's Inquest and no other documents were identified to support these allegations. Significantly, these responses came after a long meet and confer process by counsel for the parties to identify Plaintiff's evidence that would be offered to try to oppose this motion. None of these allegations are supported by credible evidence and/or are sufficient to defeat Defendants' motion.[3] All of Plaintiff's claims for relief are subject to Defendants motion for summary judgment, or in the alternative, motion for summary adjudication.

### B.    Summary Judgment Standards

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. FRCP 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Insurance Co. of North America, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Where the moving party does not bear the burden of proof on an issue at trial, the moving

---

[3] As the Court will recall, at the initial case management conference in this case on November 29, 2007, the court asked Mr. Cook what evidence he had to attempt to establish liability. After Mr. Cook responded, the Court was skeptical of Plaintiff being able to prove these claims and that Plaintiff had an uphill battle as he had no witnesses to support his liability allegations. As we agreed with the Court's impressions, we then followed up with specific, directed discovery as stated above to flush out any evidence to support Plaintiff's 4th Amendment claim. Plaintiff's responses are patently inadequate to prove a constitutional violation.

1    party may discharge its burden of showing that no genuine issue of material fact remains by

2    demonstrating that "there is an absence of evidence to support the non-moving party's case."

3    Celotex, 477 U.S. at 325. The moving party is not required to produce evidence showing the

4    absence of a material fact on such issues, nor must the moving party support its motion with

5    evidence negating the non-moving party's claim. Id.; see also Lujan v. National Wildlife

6    Federation, 497 U.S. 871, 885 (1990); Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1409 (9th

7    Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's

8    case, the burden shifts to the opposing party to produce "specific evidence, through affidavits or

9    admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409. This

10   requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's

11   position," there must be "evidence on which the jury could reasonably find for the plaintiff."

12   United States ex rel. Anderson v. N. Telecom, Inc., 52 F.3d 810, 815 (9th Cir. 1995). "The more

13   implausible the claim or defense asserted by the nonmoving party, the more persuasive its

14   evidence must be to avoid summary judgment." Id. A complete failure of proof concerning an

15   essential element of the non-moving party's case necessarily renders all other facts immaterial.

16   Celotex, 477 U.S. at 323.

### C.    Defendant Deputy Patzer is Entitled to Qualified Immunity

18       Qualified immunity shields an officer from suit when he or she makes a decision that,

19   even if constitutionally deficient, reasonably misapprehends the law governing the circumstances

20   he or she confronted. Brosseau v. Haugen, 543 U.S. 194, 198 (2004), citing Saucier v. Katz, 533

21   U.S. 194, 206 (2001) (**qualified immunity operates "to protect officers from the sometimes**

22   **'hazy border between excessive and acceptable force'"**). (emphasis added). When confronted

23   with a claim of qualified immunity, a court must first ask that taken "in the light most favorable to

24   the party asserting the injury, do the facts alleged show the officer's conduct violated a

25   constitutional right?" Brosseau v. Haugen, 543 U.S. 194, 197 (2004), citing Saucier, at 201.

26       Even if the above question is answered in the affirmative, meaning the court finds Deputy

27   Patzer's actions objectively unreasonable under the 4th Amendment, the next inquiry is whether,

28   at the time of the officers' actions, it was clearly established that the officer's conduct violated the

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1   constitutional rights of the injured person. Brosseau, at 199-200, citing Saucier, at 202. In other

2   words, because the focus is on whether the officer had fair notice that his or her conduct was

3   unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.

4   Brosseau, at 198. If the law at that time did not clearly establish that the officers' conduct would

5   violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens

6   of litigation. Id. The Plaintiff bears the burden of proving the existence of a clearly established

7   right at the time of the alleged impermissible conduct. David v. City of Fremont, 2006 U.S. Dist.

8   LEXIS 57211, *47-49 (N.D. Cal. 2006). If Plaintiff meets their burden of proving the existence

9   of a clearly established right at the time of the alleged impermissible conduct, the next inquiry is

10  whether a reasonable official could have believed that the conduct was lawful. Id. at 48.

11      Here, Plaintiff cannot prove that Defendant Deputy Patzer violated Decedent's 4th

12  Amendment rights. Even if Plaintiff can somehow prove a genuine issue of material fact exists,

13  Deputy Patzer is still entitled to qualified immunity per the second prong of Saucier.

14          1.      Defendant Patzer Acted in an Objectively Reasonable Manner
                    Under the 4th Amendment in His Use of Deadly Force
15

16      Plaintiff alleges claims for excessive force arising out of the shooting of Decedent per the

17  1st, 4th and 5th claims for relief in Plaintiffs' Complaint. As is clear, the crux of Plaintiff's case

18  here is claimed unreasonable and excessive force under the 4th Amendment, though he also

19  includes a state law wrongful death claim and a related state law civil rights claim. Claims of

20  excessive force are to be judged under the 4th Amendment's **"objective reasonableness"**

21  **standard**. Brosseau v. Haugen, 543 U.S. 194, 197 (2004), citing Graham v. Connor, 490 U.S.

22  386, 388 (1989) (emphasis added).[4] Determining whether the force used to effect a particular

23  seizure is reasonable under the 4th Amendment requires a "careful balancing of the nature and

24  quality of the intrusion on the individual's 4th Amendment interests against the countervailing

25

26  [4] The "objective reasonableness" standards of Graham and Garner have been extended to state law negligence and
    intent based claims involving police use of force. Martinez v. County of Los Angeles (1996) 47 Cal.App.4th 334,

27  343-344; Edson v. City of Anaheim (1998) 63 Cal.App.4th 1269, 1273-74 [plaintiff must prove unreasonable force to
    establish liability for both wrongful death and intentional tort claims against a police officer]. As such, if Defendants

28  can prevail under the 4th Amendment or qualified immunity is given, all state law negligence and intent based claims
    will also be adjudicated in Defendants favor, namely the 1st, 4th and 5th claims for relief.

governmental interests at stake." Graham, 490 U.S. at 396. In Graham, the Supreme Court adopted an objective reasonableness test that requires an analysis of "facts and circumstances of each particular case, including the (1) severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)) (emphasis added). A police officer may reasonably use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. at 11. Garner is simply an application of the 4th Amendment's reasonableness test articulated in Graham and deadly force cases are to be analyzed per reasonableness standards. Scott v. Harris, 127 S.Ct 1769, 1777 (2007).

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. It cannot be underscored enough that "[T]he calculus of reasonableness must embody allowance for the fact that **police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation**." Id. at 396–97. (emphasis added).

As aptly stated by the Sixth Circuit Court of Appeals in Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992), cert. denied:

> [W]e must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

Furthermore, as stated succinctly by the 11th Circuit, "from the viewpoint of an officer confronting a dangerous suspect, "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994). (emphasis added). Further, the 4th Amendment does not require a law enforcement officer to exhaust every alternative before using justifiable deadly force. Plakas v. Drinski, 19 F.3d 1143, 1148 (7th Cir. 1994).

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

A Ninth Circuit case with similar facts to this case found the officer's use of deadly force constitutional. <u>Billington v. Smith</u>, 292 F.3d 1177 (9th Cir. 2002). In <u>Billington</u>, an off duty police officer ("Smith") spotted a vehicle being driven recklessly. When Smith attempted to pullover the suspect, the suspect fled and then got into an accident. Smith got out of his car and approached the suspect to see if he needed medical aid. When Smith approached, the suspect started hitting, grabbing, and choking Smith. The fight escalated to where the suspect tried to grab Smith's gun so Smith shot and killed the suspect. <u>Id</u>. at 1179-1181. <u>Even though there was a question of fact as to whether or not the suspect and Smith were grappling over the officer's gun at the moment of the shooting, that dispute was not material as it was reasonable for Smith to fire at the suspect under all circumstances existing at that point in time, including the fact that Smith was locked in "hand-to-hand combat and losing."</u> <u>Id</u>. at 1183, 1185. (emphasis added). The Court stated that under the circumstances, a reasonable officer would perceive a substantial risk that the suspect would seriously injure or kill him, either by beating and kicking him or by taking his gun and shooting him with it. <u>Id</u>. at 1185. Ultimately, the deadly force used by Smith was found to be justified. <u>Id</u>.

Similarly, other cases have found that when a suspect is violently resisting arrest and/or making threatening gestures, deadly force is justified. <u>Forrett v. Richardson</u>, 112 F.3d 416, 420-421 (9th Cir. 1997 (finding no 4th Amendment violation when officers shot an unarmed fleeing suspect in the back after a violent residential burglary as he still posed a serious threat of harm to the officers or others);. Ultimately, **it is not unreasonable for a police officer to use deadly force in self-defense**. <u>Romero v. Bd. Of County Comm'rs of the County of Lake, Colorado</u>, 60 F.3d 702 (10th Cir. 1995). (emphasis added).

Other courts are in line with these authorities. For example, in <u>Tom v. Voida</u>, 963 F.2d 952 (7th Cir. 1992), a police officer benevolently approached an 18 year old whom she did not suspect of any wrongdoing. This innocent encounter progressively escalated into a foot pursuit, a violent struggle and ultimately a fatal shooting of the citizen. <u>Id</u>. at 954. After analyzing the event step by step, the Court concluded that the victim's actions, not the officer's reactions, precipitated every step of the escalation to violence. <u>Id</u>. At the time when the officer shot the

1    victim, the victim had already beat the officer and was moving aggressively towards the officer.

2    Id. at 961. Also, the victim was actively and violently resisting the officer, not fleeing. Id. at

3    962. The Plaintiff had no witnesses who could testify that the victim was surrendering, had no

4    scientific evidence that the victim was retreating from the officer and obviously no testimony

5    from the decedent victim. Id. at 961. Ultimately, the officer was justified in concluding that the

6    victim could not be subdued except through gunfire as the victim had already inflicted serious

7    bodily injury on her and threatened to continue doing so. Id. at 962. (See also Parks v. Pomeroy,

8    387 F.3d 949, 956-958 (8th Cir. 2004) (Qualified immunity given to officer who shot into the

9    back of the shoulder of the aggressor of a fight with another officer as it was not clearly

10   established that shooting an unarmed person who is violently struggling with another officer was

11   unlawful); Crabtree v. Hair, 2007 U.S. Dist. LEXIS 82502, *26-26 (N.D. Okl.. 2007) (Finding no

12   4th Amendment violation when the officer, who had been locked in a violent struggle and had

13   suffered vision loss at the hands of decedent, shot decedent when decedent had moved perhaps 20

14   plus feet away from the officer as the officer was still in fear for his life).

15   Here, looking at the totality of the circumstances facing Deputy Patzer, it is clear that

16   Deputy Patzer's use of deadly force comported with the 4th Amendment. First of all, Deputy

17   Patzer believed he was chasing a felony suspect who was involved in a stolen vehicle crime.

18   Indeed, all the objective evidence of the Mustang's condition made it very likely that it had been

19   stolen. (See Exh. F). Car theft is a dangerous felony crime and is often associated with violence.

20   Bull v. City & County of San Francisco, 2006 U.S. Dist. LEXIS 9120, * 46 (N.D. Cal. 2006). In

21   addition, Decedent's reckless driving prior to stopping his vehicle may have risen to a felony

22   offense. Further, once Decedent attacked and struck Deputy Patzer, he committed a felony

23   battery of a peace officer at a minimum. Overall, it cannot be disputed that the first Graham

24   factor, the severity of the crime at issue, was met under these circumstances.

25   The second and third Graham factors, whether the suspect poses an immediate threat to

26   the safety of the officer or others and whether the suspect is actively resisting arrest or attempting

27   to evade arrest by flight, are also satisfied here. Initially, there is no dispute that Decedent fled

28   from police on foot after being initially detained. After Deputy Patzer caught up to Decedent,

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    Decedent initiated aggressive contact by punching Deputy Patzer in the head, dazing Deputy

2    Patzer. Decedent then continued to punch and take swings at Deputy Patzer, some of which made

3    contact and others were deflected by Deputy Patzer's attempted defensive maneuvers. Deputy

4    Patzer did not know whether or not Decedent had a weapon on him when he fled or whether or

5    not he was able to obtain one during his flight. In the total darkness of the side yard, Deputy

6    Patzer could not see the hands or waistband of Decedent during the altercation, but only the

7    aggressive silhouette of Decedent. After Deputy Patzer tried to push Decedent away several

8    times, instead of fleeing, Decedent continued to aggress at Deputy Patzer, pushing Deputy Patzer

9    down and hovering over the Deputy. Deputy Patzer's safety was under immediate attack by

10   Decedent. Also, it was during this time that Decedent pushed Deputy Patzer into what we now

11   know was the air conditioner unit, which Deputy Patzer reasonably believed at the time was

12   perhaps another aggressor.

13   Decedent continued to actively resist at all times by attacking Patzer when he could have

14   fled and Decedent's resistance did not stop until Deputy Patzer fired his weapon. Deputy Patzer

15   continued to order Decedent to stop resisting, but Decedent continued to attack the Deputy.

16   Deputy Patzer's injuries, including the knot to his head and the scrapes to his body, plus the

17   damages to his uniform demonstrate objective evidence of the severity of the struggle and attack

18   by Decedent. It was only after Decedent was hovering over and prevailing over Deputy Patzer

19   for the third time that Deputy Patzer shot one time to try to protect himself from serious bodily

20   injury or worse and stop Decedent's violence.

21   **At no point in time did Decedent ever stop resisting.** Decedent showed significant

22   strength due to his high level of methamphetamine intoxication and had this altercation continued

23   further, there was a strong likelihood that Decedent would have overpowered Deputy Patzer to

24   the point of seriously injuring or killing him. Deputy Patzer did not have the opportunity to try to

25   use other force options in the narrow and dark side yard area due to Decedent's immediate and

26   overwhelming aggression, the rapidity of the events and the confines of the area. Deputy Patzer

27   was in fear of his life and fired his weapon (in a retained position) to attempt ward off the assault

28   and battery from Decedent. Most, if not all, officers in Deputy Patzer's shoes would have taken

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    the same action in firing at the violent Decedent to repel the aggression, demonstrating that

2    Deputy Patzer acted in an objectively reasonable manner. Like the officers in <u>Billington</u> and

3    <u>Tom</u>, and similar authorities, Deputy Patzer was locked in hand-to-hand combat and losing and

4    needed to resort to deadly force to prevent himself from being serious injured or killed by

5    Decedent. Deputy Patzer's actions comported with the 4th Amendment.

6        2.    <u>Even if the Court Finds a Triable Issue Relating to Whether or Not</u>
           <u>There Was A Constitutional Violation Under the 4th Amendment,</u>
7          <u>the Defendant Officer Is Still Entitled to Qualified Immunity</u>

8        Should the Court find a triable issue of fact that Deputy Patzer violated Decedent's

9    constitutional rights per the 4th Amendment, Deputy Patzer is still entitled to judgment as a matter

10   of law per qualified immunity as it was not clearly established that shooting a violently aggressive

11   resistive person, who is winning in a hand-to-hand struggle with the officer, was unlawful. Even

12   if the Court finds Deputy Patzer's actions objectively unreasonable, which we believe cannot be

13   found here, the next inquiry is whether, at the time of the officers' actions, it was clearly

14   established that the officer's conduct violated the constitutional rights of the injured person.

15   <u>Brosseau</u>, at 199-200, citing <u>Saucier</u>, at 202. If Plaintiff meets their burden of proving the

16   existence of a clearly established right at the time of the alleged impermissible conduct, the next

17   inquiry is whether a reasonable official could have believed that the conduct was lawful. <u>David</u>,

18   at 48.

19       Here, Plaintiff can point to no case where a court has established that an officer cannot use

20   deadly force when being constantly attacked and threatened by a suspect in a dark and confined

21   space. On the contrary, several cases, as stated above, have indicated that deadly force under

22   similar circumstances is lawful. (See <u>Brosseau v. Haugen</u>, 543 U.S. 194, 200-201 (2004) (finding

23   that it was not clearly established in 1999 that shooting a fleeing suspect in the back as he fled in

24   his vehicle, potentially endangering nearby officers and others, was a 4th Amendment violation,

25   and noting that "this area is one in which the result depends very much on the facts of each

26   case."); <u>Blanford v. Sacramento County</u>, 406 F.3d 1110, 1119 (9th Cir. 2005) (finding qualified

27   immunity as it was not clearly established in November of 2000 that officers could not use deadly

28   force to prevent someone with an edged sword, who had failed to respond to police commands

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1   and warnings, from accessing a private residence where they or people in the house or yard might

2   be serious injured); Boyd v. City of San Francisco, U.S. Dist. LEXIS 33831 *2-6 (N.D. Cal.

3   2007) (Judge Chesney found that even though there was a factual issue as to whether or not the

4   use of deadly force was necessary to prevent Boyd from escaping at the moment Officer

5   O'Malley fired his gun at him, Officer O'Malley was entitled to qualified immunity with respect

6   to the 4th Amendment because the law was not sufficiently settled, at the time of the incident, that

7   Officer O'Malley was not entitled to use deadly force in the circumstances he confronted);

8       These significant binding (Billington, Brosseau, Blanford, Forrett, Boyd) and persuasive

9   (Tom, Parks, Crabtree) authorities show that it is not clearly established that shooting at a

10  repeatedly attacking felony suspect, who is winning the fight with the officer, who may be armed,

11  and may not be the lone aggressor, is a violation of the 4th Amendment. On the other hand, these

12  authorities stand for the proposition that it was reasonable and proper for Deputy Patzer to defend

13  himself using deadly force under these circumstances. No case has precluded Deputy Patzer from

14  using deadly force in his situation. As such, Deputy Patzer is entitled to qualified immunity.

15      Furthermore, even assuming Plaintiff can show that the law was clearly established that

16  Deputy Patzer's actions violated the constitution (which Plaintiff cannot), a reasonable officer in

17  the circumstances facing Deputy Patzer here could have believed that his use of deadly force to

18  stop the violently threatening Decedent was lawful. Due to Decedent's escalation of violence and

19  continued aggression, Deputy Patzer was forced to resort to deadly force to defend himself

20  against the potentially deadly threat profile posed by Decedent. Deputy Patzer reasonably

21  believed that Decedent posed a threat of serious bodily injury or death to himself, which was

22  evident when Decedent landed punches on Deputy Patzer, was on top of him several times and

23  failed to flee or retreat when given several opportunities to do so. It was as if Decedent would do

24  almost anything to avoid capture, including trying to kill or mame Deputy Patzer at all costs.

25      Even if Deputy Patzer was mistaken about his ability to use deadly force to fend off

26  Decedent, his mistake was reasonable under the tense, uncertain and swift circumstances he was

27  presented. Blanford v. Sacramento County, 406 F.3d 1110, 1119 (9th Cir. 2005). At a minimum,

28  Deputy Patzer's conduct fell within the "hazy border between excessive and acceptable force,"

1    entitling him to qualified immunity. <u>Saucier v. Katz</u>, supra, at 206.

2    **D.    Defendant Deputy Patzer's Use of Deadly Force Did Not Violate the
3    Plaintiff's 14th Amendment Rights for Maintaining a Parental
     Relationship**

4        Plaintiff also alleges a § 1983 claim for violation of the parental relationship, an interest

5    protected by the 14th Amendment, against Defendant Patzer. "It is well established that a parent

6    has a fundamental liberty interest in the companionship and society of his or her child and that the

7    state's interference with that liberty interest without due process of law is remediable under 42

8    U.S.C. § 1983." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004); <u>Lee v. City of Los

9    Angeles</u>, 250 F.3d 668, 685 (9th Cir. 2001). The constitutional interest in familial companionship

10   and society protects against deprivations that are a result of "unwarranted state interference." See

11   <u>Lee</u>, 250 F.3d at 685; <u>Crowe v. County of San Diego</u>, 359 F.Supp.2d 994, 1039 (S.D. Cal. 2005).

12   Where a claim for interference with familial relationships is integrally predicated upon, or

13   entwined with, other conduct that is alleged to be unconstitutional, a finding that the other

14   conduct was constitutional will preclude recovery for interference with familial relationship. See

15   <u>Gausvik v. Perez</u>, 392 F.3d 1006, 1008 (9th Cir. 2004); <u>Schaefer v. Goch</u>, 153 F.3d 793, 799 (7th

16   Cir. 1998) ("Because we have concluded that Sergeant Goch did not violate Kathy Nislowski's

17   rights under the Constitution, her parents' claims based on the loss of her society and

18   companionship necessarily fail as well."); <u>Crowe</u>, 359 F.Supp.2d at 1039.

19       Here, Plaintiff's claim based upon the loss of his society and companionship of Decedent

20   is predicated and entwined with Plaintiff's claim for a violation of Decedent's 4th Amendment

21   rights against excessive force. But for the shooting incident, Plaintiff would not be able to raise

22   such a claim. In that vein, as stated above, Deputy Patzer's actions did not violate the 4th

23   Amendment and if any such violation can be found, Deputy Patzer is entitled to qualified

24   immunity, barring Plaintiff's 14th Amendment claim for interference with Plaintiff's familial

25   relationship. As such, this claim fails as a matter of law in light of the 4th Amendment analysis

26   above.

27   **E.    Plaintiff Cannot Demonstrate Any _Monell_ Related Claims**

28       Plaintiff has also alleged a _Monell_ related claim in this case per his third claim for relief.

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1    To prevail on a § 1983 claim against a municipality, a plaintiff must show (1) that he suffered a

2    deprivation of a constitutionally protected interest; and (2) that the deprivation was caused by an

3    official policy, custom or usage of the municipality. Monell v. New York Department of Social

4    Services, 436 U.S. 658, 690-691 (1978). Municipal liability based on alleged unconstitutional

5    acts of employees cannot be established on the basis of respondeat superior, but rather requires

6    proof that the harm was caused by the policy or custom of the municipality. Id. at 694. While

7    liability of municipalities does not depend upon the liability of individual officers, it is contingent

8    on a violation of constitutional rights meaning without an underlying constitutional violation,

9    there can be no municipal liability. Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994).

10    As Deputy Patzer did not violate any constitutional rights of the Decedent, neither Sheriff

11    Rupf nor the County of Contra Costa can be liable under 42 U.S.C. § 1983. Forrett v.

12    Richardson, 112 F.3d 416, 421 (9th Cir. 1997) (no Monell liability when the individual officers

13    inflicted no constitutional harms); Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996)

14    (same). Therefore, no Monell related claims can survive this motion.

15    Even if the Plaintiff can demonstrate a constitutional violation and defeat Deputy Patzer's

16    qualified immunity arguments in this regard, Plaintiff cannot set forth any evidence showing a

17    policy, custom or practice of the Sheriff or County to prove their Monell claim. There is no

18    evidence that the Sheriff or County had a policy of using excessive and/or deadly force. There is

19    no evidence that the County has been involved in a significant number of deadly force shootings

20    prior to this incident. Nor is there any evidence that the County failed to properly train Deputy

21    Patzer which amounts to deliberate indifference to the rights of the persons with whom the police

22    come into contact. City of Canton v. Harris, 489 U.S. 378, 390-391 (1989). In fact, Deputy

23    Patzer was extensively well trained, especially with regard to use of force and deadly force issues.

24    As such, there is no evidence to which a trier of fact could conclude that municipal liability is

25    present versus either the Sheriff or the County so this Monell claim fails as a matter of law.

26

27

28

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

F.    **Plaintiff's Additional State Law Claims Also Fail as a Matter of Law**

1.    Plaintiff's State Law Claims Fail As Defendant Patzer Acted in Accordance with the Fourth Amendment

In addition to the constitutional claims, Plaintiffs other state law claims also fail as stated above. In this case, Plaintiff alleges wrongful death (negligence) and state civil rights claims per the 4th and 5th claims for relief. As stated above in Footnote 3, all state law negligence and intent based claims are judged per the "objective reasonableness" standard. Martinez v. County of Los Angeles (1996) 47 Cal.App.4[th] 334, 343-344; Edson v. City of Anaheim (1998) 63 Cal.App.4[th] 1269, 1273-74. As analyzed in detail above, Deputy Patzer's actions under this tense and threatening situation clearly and objectively warranted the use of deadly force to stop the constant escalating aggression of Decedent. No reasonable trier of fact can conclude that Deputy Patzer was not entitled to use deadly force to protect himself from Decedent's violence and apparent attempt to seriously injure and/or kill Deputy Patzer. As Deputy Patzer's conduct under these circumstances, as viewed from the perspective of a reasonable officer in Deputy Patzer's shoes, was objectively reasonable, all Plaintiff's state law negligence and intent based claims, namely the 4th and 5th claims for relief, also fail as a matter of law.

2.    Even if the Court Finds a Triable Issue With Regard to Any State Law Claims, Defendant Patzer Is Still Entitled to Immunity

Should the Court find any triable issues of material facts with regard to the state law claims, Deputy Patzer should still prevail on these state law claims per the immunities offered to peace officers performing discretionary acts within the course of their employment. Under California Government Code ("GC") § 820.2, the "discretionary immunity" rule, public employees are immunized from liability in performing discretionary acts within the scope of their employment. A discretionary act, as opposed to a ministerial task, requires "personal deliberation, decision and judgment". McCorkle v. Los Angeles, (1969) 70 Cal. 2d 252, 261. A police officers' decision to use deadly force is a discretionary act. People v. Rivera, (1992) 8 Cal.App.4[th] 1000, 1007. Further, if a shooting officer is given immunity, the County is also entitled to immunity. According to GC § 815.2, "a public entity is not liable for an injury

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1   resulting from an act or omission of an employee of the public entity where the employee is

2   immune from liability." In other words, the County's immunity depends upon whether the officer

3   is immune. Robinson v. Solano County, (9th Cir. 2002) 278 F.3d 1007, 1016.

4       In this case, Deputy Patzer's use of deadly force in the face of the significantly threatening

5   and aggressive profile posed by Decedent entitles him to immunity for exercising the discretion to

6   use deadly force. As Deputy Patzer is immune for this exercise of discretion, the County is

7   likewise immune for these state law claims. These state law claims are subject to summary

8   judgment.

## V. CONCLUSION

10      For the above stated reasons, Defendants are entitled to judgment as a matter of law.

12  Dated: August 5, 2008              McNAMARA, DODGE, NEY, BEATTY, SLATTERY,
                                       PFALZER, BORGES & BROTHERS LLP

14
                                       By: _____
15                                         James V. Fitzgerald, III / Noah G. Blechman
                                           Attorneys for Defendants
16                                         COUNTY OF CONTRA COSTA, JOSHUA PATZER,
                                           and WARREN RUPF

PROOF OF SERVICE BY MAIL (C.C.P. §§ 1013a, 2015.5)

I hereby declare that I am a citizen of the United States, am over the age of eighteen years, and not a party to the within action; my business address is 1211 Newell Avenue, Walnut Creek, California 94596.

On this date I served the foregoing **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ SUMMARY ADJUDICATION** on the parties in said action, by placing a true copy thereof enclosed in a sealed envelope addressed as listed below for mailing. I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid, in the United States Post Office mail box at Walnut Creek, California, addressed as follows:

**Attorneys For Plaintiff:**

Larry E. Cook, Esq.
Casper, Meadows, Schwartz & Cook
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596

Phone: 925-947-1147
Fax: 925-947-1131

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 5, 2008 at Walnut Creek, California.

SABRINA AHIA

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330