# EXHIBIT 1

ROGER A. CLARK

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

EXPERIENCE

### Police Procedures Consultant (self employed)
April 1, 1993 to Present....................................................................**12 years**

I am a court certified expert in jail and police procedures in Federal and State
Courts.  I select my cases carefully and have consulted in approximately 412
cases thus far since my retirement from the Los Angeles County Sheriff's
Department.

### Substitute Teacher, Madison School District
August 1994 to 2003......................................................................... **9 years**

I substitute teach at all levels in the school district (elementary to high school).
As a volunteer, I wrote and managed a $85,000.00 federal grant for our
Central High School.  This grant is in its sixth year and has generated
$510,000.00 for the school.

### District Liaison, State of Idaho Department of Juvenile Corrections
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties
in the Seventh Judicial District.  As such, I worked closely with Probation
Officers, County Commissioners, Judges, other state agencies, private care
providers, etc. in the implementation of the new Idaho Juvenile Corrections
Act of 1995.  I wrote or participated in the writing of several federal grants for
the District.  I conducted training - both formal and informal - and developed a
series of new therapy programs for juveniles with private care providers.  I
also served as the Director of the Detention Center and the State Placement
Coordinator during this time.

**Los Angeles County Sheriff's Department**

December 1, 1965 to March 31, 1993.................................**27 years 4 months**

**Note:** In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.


**Service as a Lieutenant (15 Years, 0 Months):**


1. **Field Operations Region I**
   **NORSAT**                    11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders. This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County. The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees. The 1992 budget set at $1.5 million. The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.


Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.


2. **Executive Offices**
   **Reserve Forces Bureau**     05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.


3. **Field Operations Region I**
   **Crescenta Valley Station**      04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

4.    **Custody Division**
      **Central Jail**              04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of
California, with a daily inmate population of seven thousand (7,000), an
assigned staff of six hundred (600), and two hundred (200) civilian personnel.
My service at this command was equally divided into two major assignments:

- Training and Logistics Lieutenant (04/01/79 to 04/01/80).
- Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

- "Hot Fire" Training program, which is now a State (POST) mandated
  training module for all custody personnel throughout California.
- The "Defend in Place" fire safety operational plan for jail facilities.
- New fire safety specifications for jail bedding and mattresses.
- The development of fire safe jail mattress material.
- The development of a facility emergency response plan.
- The computerization of training, timekeeping, and scheduling for the
  facility (800 sworn and 200 civilian personnel).
- "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


5.    **Administrative Division**
      **Federal Surplus Property**    01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my
previous assignment (Emergency Operations Bureau). The unit provides
millions of dollars in free federal excess and surplus food and property from
clothing to heavy equipment and aircraft to the department each year. I am
very proud of this contribution to the Department.


6.    **Patrol Division**
      **Emergency Operations**    02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the
activities of the Department's planning    unit with emergency operations
planning and preparation. I was assigned as the Personnel and Logistics
Sergeant.

-4-

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.

7.    **Patrol Division**
      **Civil Defense Bureau**        12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

8.    **Patrol Division**
      **San Dimas Station**        12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant. I also frequently served as the Watch Commander.

9.    **Technical Serviced Division**
      **Communications Bureau**      12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

10.   **Patrol Division**
      **San Dimas Station**
      **Detective Bureau**        01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11.    **Patrol Division**
       **San Dimas Station Patrol**    01/29/68 to 01/01/70  **24 months**

I performed all duties assigned to Station Patrol: Jailer, Desk, Watch Deputy, Patrol, and Traffic.

12.    **Technical Services Division**
       **Transportation Bureau**    11/01/67 to 01/29/68  **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

13.    **Custody Division**
       **Central Jail**    05/06/66 to 11/01/67  **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy. I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

14.    **Administrative Division**
       **Academy**    01/17/66 to 05/06/66  **04 months**

I was a Sheriff's trainee assigned to Class #110.

15.    **Custody Division**
       **Central Jail**    12/01/65 to 01/17/66  **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

## ROGER A. CLARK

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458. Fax: (619) 258-0045.*

EXPERIENCE

### Police Procedures Consultant (self employed)
April 1, 1993 to Present...................................................................**12 years**

I am a court certified expert in jail and police procedures in Federal and State Courts. I select my cases carefully and have consulted in approximately 412 cases thus far since my retirement from the Los Angeles County Sheriff's Department.

### Substitute Teacher, Madison School District
August 1994 to 2003...................................................................... **9 years**

I substitute teach at all levels in the school district (elementary to high school). As a volunteer, I wrote and managed a $85,000.00 federal grant for our Central High School. This grant is in its sixth year and has generated $510,000.00 for the school.

### District Liaison, State of Idaho Department of Juvenile Corrections
August 1, 1995 to March 1, 1997..........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties in the Seventh Judicial District. As such, I worked closely with Probation Officers, County Commissioners, Judges, other state agencies, private care providers, etc. in the implementation of the new Idaho Juvenile Corrections Act of 1995. I wrote or participated in the writing of several federal grants for the District. I conducted training - both formal and informal - and developed a series of new therapy programs for juveniles with private care providers. I also served as the Director of the Detention Center and the State Placement Coordinator during this time.

-1-

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:** In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

**1. Field Operations Region I**
   **NORSAT**                              11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders. This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County. The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees. The 1992 budget set at $1.5 million. The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.

**2.   Executive Offices**
   **Reserve Forces Bureau**    05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

-2-

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.


3.    **Field Operations Region I**
      **Crescenta Valley Station**    04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

4.   **Custody Division**
     **Central Jail**              04/01/78 to 04/01/80 **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of
California, with a daily inmate population of seven thousand (7,000), an
assigned staff of six hundred (600), and two hundred (200) civilian personnel.
My service at this command was equally divided into two major assignments:

- Training and Logistics Lieutenant (04/01/79 to 04/01/80).
- Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

- "Hot Fire" Training program, which is now a State (POST) mandated
  training module for all custody personnel throughout California.
- The "Defend in Place" fire safety operational plan for jail facilities.
- New fire safety specifications for jail bedding and mattresses.
- The development of fire safe jail mattress material.
- The development of a facility emergency response plan.
- The computerization of training, timekeeping, and scheduling for the
  facility (800 sworn and 200 civilian personnel).
- "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


5.   **Administrative Division**
     **Federal Surplus Property**    01/12/76 to 04/01/78 **27 months**

This program was entirely my idea and developed while I was assigned at my
previous assignment (Emergency Operations Bureau). The unit provides
millions of dollars in free federal excess and surplus food and property from
clothing to heavy equipment and aircraft to the department each year. I am
very proud of this contribution to the Department.


6.   **Patrol Division**
     **Emergency Operations**    02/01/74 to 01/12/76 **23 months**

I was among the original personnel that formed this unit which blended the
activities of the Department's planning   unit with emergency operations
planning and preparation. I was assigned as the Personnel and Logistics
Sergeant.

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.

7.    **Patrol Division**
      **Civil Defense Bureau**       12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

8.    **Patrol Division**
      **San Dimas Station**       12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant. I also frequently served as the Watch Commander.

9.    **Technical Serviced Division**
      **Communications Bureau**    12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

10.   **Patrol Division**
      **San Dimas Station**
      **Detective Bureau**       01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11.    **Patrol Division**
       **San Dimas Station Patrol**    01/29/68 to 01/01/70 **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.

12.    **Technical Services Division**
       **Transportation Bureau**    11/01/67 to 01/29/68  **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

13.    **Custody Division**
       **Central Jail**    05/06/66 to 11/01/67 **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy.  I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

14.    **Administrative Division**
       **Academy**    01/17/66 to 05/06/66 **04 months**

I was a Sheriff's trainee assigned to Class #110.

15.    **Custody Division**
       **Central Jail**    12/01/65 to 01/17/66 **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

# EXHIBIT 2

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

July 15, 2008

Mr. Larry E. Cook, Attorney at Law
Casper, Meadows, Schwartz & Cook
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596

**Regarding:    *Regarding:    Shawn Day, et al, v. County of Contra Costa, et al, USDC Case No. C -07-4335 (PJH).***

Dear Mr. Cook:

Pursuant to the requirements of Rule 26, I have studied the reports and other material provided to me regarding this case.  Please be advised that if any further information develops, it is likely that a supplemental report will be necessary.  In my professional opinion, the information submitted thus far regarding this incident supports the following findings:

## Overview of Events:

On August 14, 2006, at approximately 0146 hours, Deputy Jason Vorhauer and Deputy Joshua Patzer were working patrol and were assigned to the Bay Point area as a two person unit.  Deputy Vorhauer was driving and Deputy Patzer was riding as his passenger. At the time of the incident, Deputy Patzer was assigned to the Custody Division and, as a patrol certified officer, he was working a pay-back shift because he was short on his time. Deputy Patzer and Deputy Vorhauer were friends and had attended the Academy together. Deputy Vorhauer normally worked as a one-man patrol unit, but because of Deputy Patzer's arrangement, they teamed together as a two-man unit.

While patrolling Willow Pass Road at the east end of Bay Point, they observed a black, Ford Mustang driving erratically in front of a pick-up truck.  Because of the driving

Page 1 of 13

pattern, the vehicles appeared to be connected with each other. When Deputy Vorhauer pulled behind the truck, it pulled to the side and allowed him to pass. However, the Mustang continued on. Deputy Vorhauer passed the truck and attempted to catch up to the Mustang to make an enforcement stop. By the time the deputies caught up with the Mustang, the vehicle had pulled into a driveway located at 36 Galleon Way in the City of Pittsburg.

Deputy Patzer testified that he entered the license plate of the Mustang into the MDT and when they pulled behind it they awaited the return. The system was allegedly slow and, although they waited for a brief time, they decided to approach the car without obtaining the information.

Rather than stay in positions of cover, when Deputy Vorhauer pulled in behind the vehicle, he and Deputy Patzer exited their patrol car and approached the Mustang – Deputy Vorhauer to the driver's side and Deputy Patzer to the passenger side. They observed three male occupants. Steffen Matthew Day (the deceased) was the driver; the right front passenger was Roger Zamora-Rivera; and the rear passenger was Kerry Antwaun (Stevens).

Both Deputies have stated that they observed that the Mustang had a missing trunk lock, no ignition or ignition key, and apparently no method to turn the motor off. They also observed broken window glass on the floor at the driver's feet. Deputy Vorhauer stated he immediately ordered Steffen Day out of the Mustang. When Steffen got out, he bolted past Vorhauer and ran eastbound through the front yards of the residences on Galleon Way. Deputy Patzer abandoned his position as cover for Deputy Vorhauer and pursued Mr. Day on foot, leaving Deputy Vorhauer with the two remaining passengers.

Deputy Patzer has testified that Steffen attempted to scale a side yard fence on the east side of the residence at 26 Galleon Way. Deputy Patzer testified that he caught up with him as he was climbing over a wooden fence at the east side of the residence. Deputy Patzer reported a struggle occurred as he tried to hold onto Steffen. Deputy Patzer lost his footing, fell on his back and dropped his flashlight (which was the main source of light (and his visibility of Steffen and his surroundings). Deputy Patzer also testified that he had become exhausted from the chase and the alleged struggle.

Deputy Patzer has testified that at the final stage of the confrontation, he got to his feet and separated from Steffen. When he did so, he struck his head on a portable cooling unit that was behind him and was protruding from the outer wall of residence. When this occurred, he thought he was being "ambushed" from behind by a second subject – possibly by one of the passengers that was in the vehicle with Steffen. This prompted

him to draw his weapon and fire one round at Steffen who he feared had "came back at me." Steffen Day fell to the ground and died as a result of the gunshot wound.

The trajectory of the bullet was listed at autopsy as front to back, at a downward angle (indicative of Steffen being hunched over, rather than standing erect when Deputy Patzer fired his gun). There was one expended casing found at the scene indicative of the round being fired while inside the back yard and beyond the gate where Deputy Patzer first encountered Steffen Day.

## Opinions:

*The Departure From POST Tactical Training and Requirements:*

The nature of the event (a fleeing driver of a suspect vehicle while on routine patrol) is not unusual in the mix of police work – especially in a large department like the Contra Costa Sheriff's Department – and are easily safely managed by competent officers. Deputy Vorhauer and Deputy Patzer are experienced and POST certified patrol officers. As such, they are expected to know what to do in this type of situation. Their apparent deliberate departure from their training is troubling and appears in the record as directly connected to the unnecessary shooting death of Steffen Day.

The POST Basic Academy training (which was attended by both Deputy Vorhauer and Deputy Patzer) singles out this type of dangerous and reckless behavior as: "Tombstone Courage," and identifies departures from the required tactics as "Fatal Error." Proper police tactics are basic issues frequently discussed and trained in the basic academy because they ensure the safety of officer and civilian alike. The skills are imbued as "muscle memory" responses. When cadets are unwilling and/or unable to demonstrate the requisite skills and maturity, they are discharged from service as unable to meet the requirements of the police profession.

Officers are trained that good police tactics are not only important for the safety of officers, they are also essential for the safety of the public at large. Far too often innocent persons are injured or killed by incompetent and unnecessary police acts – particularly during apprehensions of criminal suspects. These acts include engaging in a solo foot pursuit and the unjustified use of lethal force (as occurred here).

Both deputy Vorhauer and Deputy Patzer testified that when they observed the Mustang they had suspicions that it may have been stolen. This proved to be a false suspicion and should have been resolved before leaving the patrol car to approach the Mustang.

Deputy Patzer had the means and method for a quick inquiry via the MDT in his patrol vehicle. He testified that he entered the license plate but incredibly never bothered to await the return. Rather, both Patzer and Vorhauer (apparently impatient) left the safety of their patrol unit to approach the three occupants. It is contrary to POST training to do so without awaiting the return on the plate and without even advising their dispatcher of their location and situation.

It is also contrary to POST training to abandon the safety of the patrol unit and walk to the suspect vehicle under such circumstances (suspected stolen vehicle). The method required is to bring each subject out of the vehicle one-by-one under controlled circumstances. Their failure in this regard was central to what followed, because if they had followed this tactical procedure, it is very likely that Steffen Day would have remained contained in the vehicle.

*The foot Pursuit by Deputy Patzer:*

The fundamental tactical necessity for officers to remain together and forgo separating to pursue a fleeing subject cannot be overstated. Officers are trained that separating from your partner to pursue a lone fleeing suspect is extremely dangerous and frequently results in unnecessary injury and/or death. It is so inherently dangerous that a number of major agencies forbid it by policy. Also, and a fleeing suspect from vehicle is one of the basic scenarios discussed and trained at the basic academy to all POST certified officers.

The objective of the training is to develop a "muscle memory" response to always remain with your partner and use other methods of apprehension. In this case, there were three subjects in the Mustang and only two officers. When one flees, officers know that their best chance of success and only reasonable option is to contain the remaining subjects (who most likely would know the identity of the fleeing suspect) and the vehicle. Success is greatly enhanced in an urban setting where numerous other patrol units can respond quickly for a containment and search for the fleeing subject. Any such deployment could even include canine (which was the first unit to respond) and/or aero units. As a POST certified officer, Deputy Patzer was trained to remain with his partner and use this apprehension method.

Deputy Patzer's decision to engage in a foot pursuit (totally by himself) can only be viewed as deliberately reckless and dangerous and an act directly connected to his shooting death of Steffen Day.

*Other Key Factors:*

As stated above, the tactical decisions that occurred in this case are troubling and, fall far below any acceptable professional standard. They also demonstrate a gross level of immaturity that must be avoided in the police profession. In my opinion, both Deputy Vorhauer and Deputy Patzer, by virtue of their experience and training, knew better, and, deliberately decided on other methods which are directly connected to the shooting death of Steffen Day. Such irresponsible and reckless decisions clearly put innocent persons (both civilian and officer alike) at risk of injury and death (as occurred here). Specifically their gross acts of negligence included:

- Failure to wait for the MDT response.

- Separating from each other to engage in a solo foot pursuit.

- Failure to notify the Communications Division of the situation at hand throughout this incident.

- Failure to notify and call in other units in and coordinate a safe containment operation for the apprehension of the suspect at large.

- Failure to use other, less lethal methods during the alleged struggle (OC Spray, Baton, etc.)

- Deputy Patzer shooting when he was not actually in danger.

*Deputy Patzer's Use of Deadly Force:*

The use of deadly force constitutes a lawful and justifiable act of self-defense when the officer using deadly force actually and *reasonably believes* one or more of the following facts exist:

- That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.

- That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.

Page 5 of 13

- That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime, or other obvious factors. In such cases deadly force is not allowed to prevent the escape of misdemeandents and most felony suspects (including suspected auto theft).

Thus, it is necessary to determine whether, at the moment Deputy Patzer decided to fire his weapon, those beliefs were reasonable. This is a core issue at the heart of this litigation. Deputy Patzer claims that he shot as an act of justifiable self defense.

It is uncontested that at the moment of the shooting, Steffen Day was an unarmed juvenile subject. Deputy Patzer had no information or knowledge that Steffen was a dangerous Felon or was wanted for any crime – felony or misdemeanor. Additionally, they had no suspicions or information that Steffen had taken any drugs or was under the influence of any drugs. No crime had been broadcast in the area to alert patrol units to the Mustang. Neither Deputy Vorhauer nor Deputy Patzer had any reason to apprehend him other than he had fled the scene of a vehicle pull-over. Additionally, his demonstrated intent at the time of his alleged confrontation with Deputy Patzer was flight from apprehension. It must also be noted that Steffen displayed absolutely no weapons of any kind during the entire incident. His only alleged use of physical resistence at the time he was shot involved nothing more than his hands and fists.

I have noted that Deputy Patzer has testified that he fired his gun because he bumped (backed) into an object behind him and thought he was being attacked by additional suspects who had left the Mustang and were now behind him. Of course this clearly speaks to the necessity for officers to stay together and not separate. This was clearly an imaginary (subjective) fear that had its genesis in the solo foot pursuit and ended with Deputy Patzer imagining that somehow suspects had gotten behind him and he was trapped between them. There is noting in the record that Deputy Patzer had any sensory indication (hearing, touch or visual) that any one other than he and Steffen were in the back yard at the time he fired his gun. Any such fear cannot be considered as *objectively reasonable* and, as such cannot justify the use of lethal force.

Deputy Patzer's clear violation of this POST policy prophetically predicted the expected outcome of this case. This violation of established training and procedure is simply not expected from certified police officers.

This violation of policy must also be considered in context of the training provided during the BASIC POST Academy. As with a number of professions wherein the lives and well-

being of citizens are entrusted to select individuals, the police profession requires skill, maturity and good judgment. In this regard, police training uses a variety of training methods to embed a "muscle memory" response to emergent situations involving the possible use of deadly force. One of the purposes of the training is to provide the expected correct immediate field response. Common training methods used include:

- Classroom Lecture.
- Basic Periodic Range Qualification.
- Combat Range Training.
- Hogan's Alley.
- FATS.
- Laser Village.
- Paint Ball.
- Field Scenario-Role Play Training.

In view of the extensive training and testing provided to Deputy Patzer regarding the tactical and shoot-don't shoot decision skills required, it was reasonably expected that he would follow his training and not resort to the use of lethal force

**Items Studied:**

1. The Plaintiff's claim for damages.

2. Coroner's Inquest Transcript, December 20, 2006, Case No. 2006-1851.

3. Witness Interview: Mr. Henry Martin.

4. Letter dated 6/24/08 to Mr. Larry E. Cook from defendants' attorney producing the following:
   (a) Dispatch recording (CD: Deposition of Joshua Patzer).
   (b) Incident history detail; unit history inquiry report; Pittsburg P.D.
   (c) Continuation/Supplementary Report (with CD).

5. CD and printouts of that CD as follows:
   (a) Autopsy Photos
   (b) Crime Lab Scene Photos (3 sets)

6.    CD and printout of that CD:
      (a)    Crime Lab scene photos.

7.    Death Certificate.

8.    Initial Disclosures.

9.    Discovery - Defendants (Responses to Request for Production of
      Documents).

10.   Medical Records.

11.   Autopsy Report.

12.   Deposition of Deputy Joshua Patzer, taken May 29, 2008 (with exhibits).

13.   Sheriffs Office Investigation into 10/23/03 complaint against Deputy Patzer
      & Deputy Brown

14.   Police Reports regarding this incident.

15.   Personnel File: Deputy Joshua Patzer.

16.   Interview of Deputy Joshua Patzer (printout and CD of Audio Recording).

17.   Four videos on CD:

      (a)    Interview of Deputy Berry.
      (b)    Steffen Day Leifi.
      ©  Inspector Lyn Interviews with: (d)
             (1)    P. Manual
             (2)    F. Morero
             (3)    J. Torres
             (4)    R. Malig
             (5)    S. Padilla

      (d).   Inspector Menchaca Interviews with:
             (I)    McKinly
             (2)    R. Greenburg
             (3)    Pittsburg Police Department Officer Reddoch.

18.    POST Training Domain # 1 – "History, Professionalism and Ethics."

19.    POST Training Domain # 2 – "Criminal Justice System."

20.    POST Training Domain # 19 – "Vehicle Operations."

21.    POST Training Domain # 20: – "Use of Force."

22.    POST Training Domain # 21: – "Patrol Techniques."

23.    POST Training Domain # 22: – "Vehicle Pullovers."

24.    POST Training Domain # 33: – "Arrest Methods/Defensive Tactics."

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriffs Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I am therefore very familiar with the physical building itself and the administrative procedures unique to the facility, and with jail environment.

In addition to my specific assignment to the Men's Central Jail, I have also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was also a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to disorderly conduct, assaults, batteries, etc., as well as felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriffs Department's Patrol School which taught the POST accepted investigation and apprehension methods.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,600 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of my 250 cases for which I have served as a consultant since 1993 have involved civilian deaths that have occurred at the hands of police officers. Additionally, the vast majority of my cases have involved some aspect regarding the use of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remains in force today, without change, and includes the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings.

I was assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and also as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital and which was serviced by a staff of more than 900 sworn and civilian personnel.

Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington. I have testified before the Los Angles Police Department Board of Rights. I have testified before the Harris County (Texas) Grand Jury. I have also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina, Oregon and Wyoming Federal and State Courts. I have never been excluded as an expert on any matter for which I have been retained. A complete listing of my expert testimony on all matters since January 2000 is attached to this report as Exhibit C.

## Conclusions:

Upon reading the above listed material, it is apparent that Deputy Patzer shot from a reasonably safe position that cannot justify the use of deadly force.

In my opinion, the investigators assigned to this shooting death never aggressively questioned either Officer regarding discrepancies evident in this shooting particularly the glaring departures from POST training and procedure. Rather, the incident reflects a group of investigators and their superiors who decided to look the other way because they knew that the use of lethal force in this case was totally unnecessary, out of policy, contrary to proper police training, and illegal.

The record supports the conclusion that this shooting seemed to have been triggered by a loss of self control and frustration over possible suspect who was getting away. This would evince a certain amount of lack of discipline, training, or restraint expected of competently trained officers. It seems plausible to believe that Deputy Patzer panicked and reacted without justification.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct. Executed July 15, 2008 at Santee, California.


Roger A. Clark