# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                              --oOo--


                                        COPY

SHAWN DAY,                              )
                                        )
              Plaintiff,                )
                                        )
      vs.                               )   No. C07-4335-PJH
                                        )
COUNTY OF CONTRA COSTA, et al.,         )
                                        )
              Defendants.               )
_____)



                 DEPOSITION OF JOSHUA PATZER




      Taken before MARTHA L. BROWN, a Certified

      Shorthand Reporter, License No. C-1901

                   State of California




                        MAY 29, 2008

                           --oOo--
```

Zandonella REPORTING SERVICE, INC.    1    Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107

| | | |
|---|---|---|
| 1 | Q. | It's basically June of '08 now. |
| 2 | A. | Almost a year now. |
| 3 | Q. | All right. And what are you doing? |
| 4 | A. | I am in the Special Investigation unit now. |
| 5 | Q. | And what is that? |
| 6 | A. | Narcotics, vice, undercover work. |
| 7 | Q. | And that's one of the reasons why you have your beard? |
| 9 | A. | Yes. |
| 10 | Q. | And who is your sergeant? |
| 11 | A. | Sergeant Jeff Moule. |
| 12 | Q. | Spell it, please. |
| 13 | A. | M-O-U-L-E. |
| 14 | Q. | And you are working out of Muir Station? |
| 15 | A. | Yes. |
| 16 | Q. | On the day of this incident, what time did you report to work? |
| 18 | A. | 9:30. |
| 19 | Q. | 9:30 P.M.? |
| 20 | A. | 9:30 P.M., yes. |
| 21 | Q. | When did you last work before you reported to work at 9:30 P.M.? |
| 23 | A. | I got off the jail at 6:00, or excuse me, at 3:30 P.M. |
| 25 | Q. | That day? |

1    A.    Yes, sir.

2    Q.    And you had gotten to work at 6:30 A.M.
3  that day?

4    A.    Yes, sir.

5    Q.    What day of the week did this incident
6  occur on; do you recall?

7    A.    I do not recall, Monday, Tuesday,
8  Wednesday.  It was August 15th, I know that.

9    Q.    Right.  But you don't know the day of the
10 week?  However --

11   A.    No.

12   Q.    -- that is easily determined.

13   A.    Yes.

14   Q.    Would you from time to time while you were
15 working overtime on patrol work at the jail during the
16 day, work a night shift on patrol and then go back to
17 the jail the next day and work?

18   A.    Yes, sir.

19   Q.    When did you sleep?

20   A.    In between shifts.

21   Q.    Okay.  And there was no prohibition at the
22 Sheriff's Department from that kind of schedule; working
23 two shifts in one day?

24   A.    No, sir.

25   Q.    Okay.  Did you sleep at all between the

```
 1   time you got off work at 3:30 and the time you started
 2   work at 6:00 P.M --
 3           A.    That --
 4           Q.    -- at 9:30 P.M.?
 5           A.    Yes.
 6           Q.    I am sorry.
 7           A.    No, sir.
 8           Q.    Did you go home?
 9           A.    No, sir.  We have a sleep room.
10           Q.    Where?
11           A.    At the 1980 Muir Road.
12           Q.    And so you left the Martinez Jail at about
13   3:30?
14           A.    Yes, sir.
15           Q.    Then you went directly to Muir Road?
16           A.    No, sir.  I got off at Martinez Detention
17   Facility --
18           Q.    At 3:30 --
19           A.    -- on Pine Street --
20           Q.    -- approximately?  Yeah?
21           A.    -- and drove to Muir Road.
22           Q.    Yes.
23           A.    I slept there.
24           Q.    Yes.
25           A.    I got up and showered there and reported to
```

1  A. Just the deputies assigned to Muir Station
2  that night and the sergeant.
3  Q. And that's Gary Clark?
4  A. Yes, sir.
5  Q. And how many different deputies?
6  A. There would be four deputies.
7  Q. Who is the fourth?
8  A. There would be two Muir Station, or two Bay
9  Point units and then two Pacheco/Martinez units.
10  Q. And Gary Clark was the patrol sergeant for
11  both of those units?
12  A. Yes, sir.
13  Q. Okay. Tell me the kind of equipment you
14  had with you there that night relative to weapons,
15  either deadly weapons or non deadly.
16  A. Do you mean in the vehicle or on my --
17  Q. Well, both in your vehicle and on your
18  person.
19  A. In the vehicle there is a shotgun, a
20  Remington 870 pump action shotgun.
21  Q. Yeah.
22  A. On my person, I carry my pepper spray, my
23  asp -- collapsible baton.
24  Q. And that's the same thing, an asp and a
25  collapsible baton, the same thing?

```
 1      A.      He's closer to that side, so he --
 2      Q.      Okay.  So you --
 3      A.      We don't cross between the cars.
 4      Q.      So the driver was his responsibility, and
 5   you were going to go to the passenger door?
 6      A.      Yes, sir.
 7      Q.      And you didn't discuss that, that's just
 8   what you knew because that's how you were trained?
 9      A.      Yes.
10      Q.      And upon your exiting your vehicle, what's
11   the next thing that you did?
12      A.      Approached the passenger side of the
13   vehicle.
14      Q.      And you had your firearm on you, correct?
15      A.      Yes, sir.
16      Q.      And tell me what kind of firearm that was,
17   sir.
18      A.      Smith and Wesson 9 mm.
19      Q.      And you had been approved for that weapon
20   at the range?
21      A.      Yes, sir.
22      Q.      And you had pepper spray?
23      A.      Yes, sir.
24      Q.      And you had your baton?
25      A.      Yes, sir.
```

```
 1  injuries you received that night?
 2       A.   The AMR came to the police station and
 3  checked me out. And that was --
 4       Q.   And were you okay?
 5       A.   I had abrasions, scrapes, cuts, my clothing
 6  was ripped. I had a knot on my head.
 7       Q.   That was from hitting the air-conditioning
 8  unit?
 9       A.   No, sir.
10       Q.   What was that from?
11       A.   From being punched by Steffen Day.
12       Q.   Okay. Other than AMR did you seek any --
13  well, you didn't seem them. They sought you, correct?
14       A.   Yes, sir.
15       Q.   Did you seek any medical attention after
16  you were seen by AMR?
17       A.   No, sir.
18       Q.   Did you miss any work for medical reasons
19  as a result of this altercation?
20       A.   No, sir.
21       Q.   Were you off work for a couple days after
22  this?
23       A.   Yes.
24       Q.   Which is sort of typical when there is an
25  officer-involved shooting?
```

1  A.  I -- we didn't discuss it, like, break it
2  down. We -- I just made sure he was all right, and that
3  he knew I was all right.
4  Q.  Have you ever talked to him about this?
5  A.  Not in depth, I don't talk about it in
6  depth to anybody.
7  Q.  Is that because there is litigation
8  pending?
9  A.  Partly, but you don't want to relive almost
10  being killed in your head.
11  Q.  Have you talked to anybody about this other
12  than your lawyers?
13  A.  I had to see a psychologist before going
14  back to work.
15  Q.  Right. And that's part of the typical
16  protocol with an officer-involved shooting?
17  A.  Yes, sir.
18  Q.  And how long did you remain in the vehicle
19  before you were taken to Pittsburg P.D.?
20  A.  It seemed -- again, seemed like a long
21  time. I had time to loosen my vest up because I was
22  trying to breathe, and --
23  Q.  You were wearing a bulletproof vest?
24  A.  Yes, sir.
25  Q.  And were you wearing gloves?

1  surroundings, which at that point were two residences.
2         The lighting, we don't just shoot blindly into
3  the night. We account for our rounds. We don't just
4  pepper spray to pepper spray. We need to be able to see
5  what we're doing and know where -- the effect.
6         MR. SCHWARTZ:
7         Q.    You had no knowledge of who this person was
8  who you were engaged with; is that fair to say?
9         A.    Yes, sir.
10        Q.    And you did not know -- you had no reason
11 to believe at the time that there were drugs or alcohol
12 involved; isn't that also true?
13        A.    Yes, sir.
14        Q.    Did you consider using your baton that
15 night?
16        A.    No, sir.
17        Q.    Did you consider using your pepper spray?
18        A.    No, sir.
19        Q.    Did you consider letting him run away?
20        A.    Yes, sir.
21        Q.    And why did you decide not to let him run
22 away?
23        A.    I gave him three chances to run away.
24        Q.    So you were prepared to let him go?
25        A.    Yes, sir.

```
 1  STATE OF CALIFORNIA    )
                           )   ss.
 2  COUNTY OF CONTRA COSTA )

 3       I, MARTHA L. BROWN, CSR, License No. CSR C-1901,

 4  State of California, do certify:

 5       That JOSHUA PATZER, the witness in the foregoing

 6  deposition, was by me first duly sworn to testify the

 7  truth, the whole truth and nothing but the truth in the

 8  within-entitled cause;

 9       That said deposition was reported at the time and

10  place therein stated by me, a Certified Shorthand

11  Reporter, and thereafter transcribed into typewriting;

12       That when so transcribed, the deposition was read

13  to or by the said witness, corrected by the witness in

14  all respects desired and duly subscribed by said

15  witness;

16       I further certify that I am not interested in the

17  outcome of said action, nor connected with, nor related

18  to, any of the parties of said action or to their

19  respective counsel.

20            IN WITNESS WHEREOF, I have hereunto set my

21  hand this 8th day of June, 2008.

22

23            _____
            MARTHA L. BROWN, CSR, License No. C-1901,
24          State of California.

25
```