1   JAMES V. FITZGERALD, III (State Bar No. 55632)
    NOAH G. BLECHMAN (State Bar No. 197167)
2   MCNAMARA, DODGE, NEY, BEATTY, SLATTERY,
    PFALZER, BORGES & BROTHERS LLP
3   1211 Newell Avenue
    Post Office Box 5288
4   Walnut Creek, CA 94596
    Telephone:  (925) 939-5330
5   Facsimile:  (925) 939-0203

6   Attorneys for Defendants
    COUNTY OF CONTRA COSTA, JOSHUA PATZER, and
7   WARREN RUPF

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  SHAWN DAY, individually and as            Case No. C07-4335 PJH
    successor in interest to the Estate of Steffen
12  Matthew Day,                              **DECLARATION OF JAMES V.
                                              FITZGERALD, III, IN SUPPORT OF
13                  Plaintiff,                DEFENDANTS' OBJECTIONS AND
                                              MOTION TO STRIKE PLAINTIFF'S
14         vs.                                PROFFERED EVIDENCE IN SUPPORT
                                              OF OPPOSITION TO DEFENDANTS'
15  COUNTY OF CONTRA COSTA;                   MOTION FOR SUMMARY JUDGMENT /
    JOSHUA PATZER; WARREN RUPF, and           SUMMARY ADJUDICATION**
16  Does 1 through 50, et al.,
                                              Date:      September 10, 2008
17                  Defendants.               Time:      9:00 a.m.
                                              Judge:     Hon. Phyllis J. Hamilton
18                                            Dept:      Courtroom 3, 17th Floor (SF)

19

20         I, James V. Fitzgerald, III, Esq., hereby declare:

21         1.  I am an attorney at law duly licensed to practice before the courts of the State of

22             California and am a partner at the law firm of McNamara, Dodge, Ney, Beatty,

23             Slattery, Pfalzer, Borges & Brothers LLP; attorneys of record for Defendants

24             County of Contra Costa, Deputy Joshua Patzer and Sheriff Warren Rupf.  I have

25             personal knowledge of each matter stated herein.

26         2.  Attached hereto as Exhibit "A" is a true and correct copy of pages of relevant

27             deposition testimony of purported expert Roger Clark, from a deposition personally

28             taken by me, in the matter of <u>Deocampo v. City of Vallejo</u>, CV-01283 WBS-GGH

DECLARATION OF JAMES V. FITZGERALD, III, IN
SUPPORT OF OBJECTIONS AND MOTION TO STRIKE
FOR MSJ/MSA - C07-4335 PJH

1      (U.S. District Court, Eastern District of California), in support of this motion.

2     3.   Attached hereto as Exhibit "B" is a true and correct copy of pages of relevant

3        deposition testimony of purported expert Roger Clark, from a deposition personally

4        taken by me, in the matter of <u>Bauer v. City of Vallejo,</u> 06-00549 MCE-DAD (U.S.

5        District Court, Eastern District of California), in support of this motion.

6     4.   Attached hereto as Exhibit "C" is a true and correct copy of pages of relevant

7        deposition testimony of purported expert Roger Clark, from a deposition personally

8        taken by me, in the above entitled action, <u>Day v. County of Contra Costa et al.,</u>

9        C07-4335 PJH, in support of this motion.

10  I declare under penalty and perjury the foregoing is true and correct.

11

12     Executed this __27th__ day of August, 2008 at _Walnut Creek_ , California.

13                 By: _____

14                      James V. Fitzgerald, III, Declarant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McNAMARA, DODGE, NEY, BEATTY, SLATTERY, PFALZER, BORGES & BROTHERS LLP
ATTORNEYS AT LAW
P.O. BOX 5288, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

COPY

JASON EUGENE DEOCAMPO, et al.,          )
                                        )
                    Plaintiffs,         )
          vs.                           ) CV-01283-WBS-GGH
                                        )
CITY OF VALLEJO, et al.,                )
                                        )
                    Defendants.         )
_____)

DEPOSITION OF ROGER CLARK

Taken before KAREN ALDERSON, a Certified

Shorthand Reporter, License No. C-6279,

County of Contra Costa, State of California

September 14, 2007

McNamara, Dodge, Ney, Beatty,
Slattery & Pfalzer LLP

SEP 2 1 2007

HAND DELIVERED

--oOo--

1      A.    Well, it's called, let's see, NJI.gov,

2  FBI.gov.  You can --

3      Q.    Well, you say you regularly do this.  I

4  assumed you --

5      A.    Yeah, I do.  Do you want me to pull up some

6  sites, is that what you're asking?  I can do that.

7      Q.    I just --

8      A.    Would you like me to send you -- the last

9  bit of research I did was on police integrity for a case

10  and pulled up about six articles from the National

11  Justice Center.

12      Q.    All right, what case did you do that for?

13      A.    It was -- the one that comes to mind is

14  Olivas versus City of Fontana.

15      Q.    What's the case?

16      A.    It was a very substantial piece of work.

17      Q.    What is the case number on that?

18      A.    It's one listed, number 142.  That's one

19  that pops into my head immediately.

20      Q.    All right.  Have you authored or published

21  any books on police work?

22      A.    No.

23      Q.    Have you ever written anything on the use

24  of force or field tactics?

25      A.    You mean that's published?  No.

**Zardonella**
REPORTING SERVICE, INC.

Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107
(925) 685-6222 • Fax (925) 685-3829

1    Q.    Have you ever written anything, period,

2  about the use of force or field tactics?

3    A.    Well, my expert reports are -- numerous

4  expert reports using or writing about the use of force.

5  I haven't published anything.  I've stuck with -- I

6  really think that POST says it all.

7    Q.    Have you taught a class on the use of force

8  in the last 16 years?

9    A.    Well, the last time I taught anything on

10  the use of force would be in 1993.

11    Q.    All right.  Have you ever taught any

12  classes on homicide investigations?

13    A.    No.

14    Q.    Have you ever been a firearms instructor?

15    A.    No.

16    Q.    Have you reviewed the POST domain on

17  background investigations?

18    A.    Yes, I have it in fact.

19    Q.    Have you ever conducted a background

20  investigation?

21    A.    Personally, an individual background

22  investigation, no, but I supervised numerous background

23  investigations when I was in reserve forces.

24    Q.    What's reserve forces?

25    A.    As you can see in my C.V. I was there four

**Zardonella**
REPORTING SERVICE, INC.

120

Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107
(925) 685-6222 • Fax (925) 685-3829

1  by holding onto a counter justifies blows from a baton,

2  and that's counter to anything that I'm aware of or as

3  thought by POST.

4       Q.    Have you ever taught any classes in the use

5  of a baton?

6       A.    I have not.

7       Q.    Have you ever taught any defensive tactics

8  classes?

9       A.    Well, there's no defense here anyone's

10 alleging, that's exactly the point.

11      MR. BURRIS:  He just asked you if you taught a

12 class.  Don't argue.

13      MR. FITZGERALD:

14      Q.    Have you ever taught a class regarding the

15 proper use of defensive tactics?

16      A.    No.

17      Q.    Okay.  In your opinion can a baton be used

18 for self defense?

19      A.    That's what it's for.

20      Q.    In your opinion can a baton ever be used to

21 assist in effectuating an arrest?

22      A.    Under rare circumstances that can be done.

23      Q.    What are those rare circumstances?

24      A.    Well, if there's a person who is armed or

25 has significant capability and has demonstrated the

**Zandonella**
REPORTING SERVICE, INC.

127

Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107
(925) 685-6222 • Fax (925) 685-3829

EXHIBIT B

1             UNITED STATES DISTRICT DISTRICT

2             EASTERN DISTRICT OF CALIFORNIA

3                 --oOo--

**COPY**

4

5  LORI BAUER,                     )

6            Plaintiff,      )

7           vs.            )   No. 06-00549

8                        )   MCE-DAD

9  CITY OF VALLEJO, et al.,     )

10           Defendants.     )

11                        )

12

13

14          DEPOSITION OF ROGER CLARK

15

16

17       Taken before JULIE MAGGI VASTA,

18       A Certified Shorthand Reporter,

19    License No. C-2947, State of California

20

21

22          July 16, 2007

23           --oOo--     McNamara, Dodge, Ney, Beatty,
                                  Slattery & Pfalzer LLP

24                        AUG 0 6 2007

25                     HAND DELIVERED


**Zandonella**
REPORTING SERVICE, INC.

1

Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107
(925) 685-6222 • Fax (925) 685-3829

1  using him as an example -- has a vested interest in

2  merely suing police for the sake of suing especially --

3  I had just minimal input on the rampart work.

4      I think he clearly has an interest in improving the

5  profession.   That's certainly my interest in --

6      Q.  He wrote that report, didn't he, the rampart

7  report?

8      A.  He sponsored it.  It was defining work on how

9  and why that tragedy occurred.

10     Q.  He actually was hired by the L.A.P.D. to write

11 a report and ended up writing a report critical of the

12 P.D.?

13     A.  He did indeed.

14     Q.  Okay.  Have you ever been retained by a law

15 enforcement agency to do any training?

16     A.  Not yet, no.

17     Q.  When did you last provide tactical training to

18 law enforcement officers?

19     A.  That would be when I was in active service in

20 1993.

21     Q.  Have you ever been retained by a law

22 enforcement agency as a consultant?

23     A.  No.

24     Q.  Have you ever tried to get into that kind of

25 work?

Zandonella
REPORTING SERVICE, INC.
58
Certified Shorthand Reporters
2321 Stanwell Drive • Concord, CA 94520-4808
P.O. Box 4107 • Concord, CA 94524-4107
(925) 685-6222 • Fax (925) 685-3829

# EXHIBIT C

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHAWN DAY, individually and as          )
successor in interest to the Estate     )
of Steffen Matthews Day,                )
                                        )
                    Plaintiff,          )
                                        )
          vs.                           ) No. C07-4335
                                        )     PJH
COUNTY OF CONTRA COSTA; JOSHUA PATZER;   )
WARREN RUPF, and Does 1 through 50,     )
et al.,                                 )
                                        )
                    Defendants.         )
                                        )

DEPOSITION OF ROGER CLARK, a witness herein,

noticed by McNamara, Dodge, Ney, Beatty, Slattery,

Pfalzer, Borges & Brothers, LLP, taken at

707 Broadway, Suite 1210, San Diego, California,

at 1:40 p.m., Thursday, July 31, 2008, before

Stephanie Riggs, CSR 12788, RPR.

Hutchings Number 196574-SD



**HUTCHINGS**℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429

**800.697.3210**   323.888.6300
FAX: 323.888.6333 • www.hutchings.com

1        A.   I never referred to Grant versus Connors.

2    It's referred to in Learning Domain #20.

3        I'm sure I did when I was -- I would talk about

4    use of force and Learning Domain #20 subsequent to that

5    but that would be why it was at -- while I was at

6    NORSAT.

7        Q.   All right.  Since you taught on use of force

8    both before and after Grant versus Connors, what's your

9    understanding of as to what effect the Grant versus

10   Connors decision had on the pre-existing state of the

11   law?

12       And I understand you are not a lawyer.  I'm asking

13   your impression as an instructor.

14       A.   Yeah, as taught by POST.  And I'll go back to

15   the time when Learning Domain #20 was titled the Legal

16   and Moral Use of Force and Firearms.

17       And in my opinion, Tennessee versus Garner and

18   Grant versus Connors really did not impact what the

19   department taught as policy and the -- and as they

20   taught at the Academy as the interpretation of force,

21   and the use of force, and what would be appropriate

22   force under the circumstances.

23       Regardless of those cases, I've always felt that

24   those cases were in the harmony of what I had always

25   learned since 1965.

                              18

1       So for me it was easy.  I did not adjust or change

2  my behavior or encourage others or teach others to

3  change their behaviors according to those cases.

4       Q.  So what's your understanding of Grant versus

5  Connors?

6       A.  Well, my use of Grant versus Connors was their

7  force is justified under the totality of circumstances.

8       It's what the officer knows at the time; not 20/20

9  hindsight as one of the nice things it says there.

10      And that there has to be an objectively reasonable

11  basis for what the officer does.

12       Q.  All right.  And if I understood your previous

13  testimony, you are saying as far as you are concerned,

14  that was the state of the law as you understood it

15  before Grant versus Connors was decided in 1989.

16       A.  Yeah.  Let me give you another good example I

17  can think of.

18       Q.  The answer to that question was yes?

19       A.  The answer was yes.  I'm sorry.  I said yeah

20  too quickly.  The answer is yes.

21       Q.  All right.

22       A.  Let me give you an example.  When I came on in

23  '65, you could shoot a fleeing felon but I was told

24  directly from the time I received the gun, do not shoot

25  everybody that runs away from you.

19

1    20/20 hindsight to his judgment, are you not?

2         MR. COOK:  Objection.  Argumentative.  Calls for a

3    legal opinion.  You can answer.

4         THE WITNESS:  No.  That was not the way I looked

5    at the case, nor was it the way I believe I wrote the

6    case and the opinion.

7         Clearly Patzer cannot be held to what finally

8    develops at the end of the day.

9         He can only be held responsible for what he knew

10   at the time and evaluated on that basis.

11        And I believe that's exactly what I did in the

12   report.

13        Now, in regard to chasing -- deciding to chase

14   Day, that decision is not -- I didn't render that

15   decision in terms of 20/20 hindsight.  They should

16   never had done it.

17        I rendered that decision based on the fact that at

18   that time, and under those circumstances with those

19   sets of facts, no officer would separate from his

20   partner and chase an individual who is fleeing when

21   there are two other suspects in a suspected stolen car;

22   you know, leave that and chase the one; leave two to

23   chase one.  It's never done -- and engage in that by

24   himself.

25        And I talk about it as terms of a muscle memory

1   decision; not a hindsight thing but a muscle memory

2   decision.

3       He would have decided that and have been trained

4   in that before he even got out of the Academy at the

5   basic level and would never be expected to do it.

6       MR. FITZGERALD:

7       Q.  Is it your opinion, based on your expertise,

8   that his decision to do what you just described

9   constituted an unconstitutional act on his part?

10      A.   Well, you are asking me a legal question.

11      MR. COOK:  Objection.  The question calls for a

12  legal opinion.  Constitutional law.

13      THE WITNESS:  I think it's -- and I think I

14  expressed it well enough in the report -- hopefully I

15  have -- that it is so -- this is such an extreme and

16  reckless departure from a fundamental rule of tactics,

17  that it can only be viewed as a deliberate act, not

18  accidental.

19      And it has to be viewed in that category

20  because -- and putting -- and it put everyone at risk.

21      And of course we know what the outcome is.  That's

22  the 20/20 hindsight.  We know what the outcome is.

23      But what he did, that decision is just stunning in

24  my opinion.  I can't overstate it.

25      MR. FITZGERALD:

23

1    chemical that -- I am going to use the term

2    fluoresces -- but it makes this residue evident on the

3    clothing.

4        One of the terms is called grise testing.  None of

5    that was done that I could see, which would either

6    eliminate or establish proximity to a certain extent.

7    And it would be valuable.

8        Q.  All right.  Let me direct your attention to

9    page 5.  Let me ask you some questions about this, your

10   list of gross negligence.

11       A.  Sure.

12       Q.  First of all, do you consider gross negligence

13   a legal term?

14       A.  Sure.

15       Q.  All right.  And you said earlier you are not a

16   lawyer, right?

17       A.  Correct.

18       Q.  Okay.  The first thing you list is failure to

19   wait for the MDT response.  Did I read that correctly?

20       A.  Yes.

21       Q.  Is it your opinion that that's -- that failure

22   to wait for the MDT response is unconstitutional

23   conduct on their part?

24       MR. COOK:  Objection.  Calls for a legal opinion.

25   Lacks foundation.

54

1          THE WITNESS:  I think there's two answers.

2          MR. FITZGERALD:

3          Q.  It calls for a yes or no and you can explain

4     it.

5          A.  Well, no.  The answer is obviously, "How would

6     I know?  I'm not a lawyer."

7          So I want to answer it this way.  I put my arm to

8     the square, the same as Patzer did, and I swore my

9     allegiance to the Constitution, just as Patzer did.

10         And I was taught at the POST Academy that part of

11    our protection of the Constitution and our oath of

12    office is not to use excessive force; not to inflict

13    unnecessary harm or use lethal force when we are not

14    allowed to.

15         There is a constitutional piece to that but I'm

16    not a lawyer.

17         MR. FITZGERALD:  Okay.  Can you read back the last

18    answer?

19         (The record is read back by the reporter.)

20         MR. FITZGERALD:  Okay.  Okay.  That's good enough.

21         Q.  What relationship is there between the use of

22    excessive force or deadly force and a failure to wait

23    for the MDT response?

24         A.  The way it's taught at the POST Academy is

25    this way:  That when very serious errors in judgment or

1   departures from the training occur, that they can be

2   identified by a specific term.

3        And the term taught is fatal error.  And the cadet

4   is told the reason we call it a fatal error is because

5   it's very likely to lead to injury or death.

6        So these errors are to be avoided as much as

7   possible.

8        And any departure from that has to be justified,

9   you know, by very sound facts or other reasons.

10       Q.  So your testimony is that the failure to wait

11   for the MDT response to verify that the car was stolen

12   was a quote, "fatal error," end quote?

13       A.  Yes.  And as you know, I comment.  I explain

14   what a fatal error is in my report.  These are six

15   fatal errors.

16       And they combine together, any one of which I

17   think would have led to a very serious outcome, but

18   together they form the soup for or make the soup for a

19   very likely tragedy.

20       Q.  Okay.  Just to make a good record here, I'm

21   going to read you the other ones.

22       A.  Correct.

23       Q.  All right.  You referred to six errors.  The

24   second one that is listed is quote, "Separating from

25   each other to engage in a solo foot pursuit."  End

56

1    quote.  Did I read that correctly?

2        A.  Yes.  That's probably the biggest of all of

3    them.

4        Q.  So you are saying that was a fatal error?

5        A.  That it was a fatal error.

6        Q.  And the fact that Patzer pursued Mr. Day by

7    himself was an unconstitutional act?

8        MR. COOK:  Objection.  Calls for speculation.

9    Lacks foundation.  Calls for a legal opinion.  Beyond

10   the scope of what this witness is qualified for.

11       MR. FITZGERALD:

12       Q.  In your opinion when he chased him alone, did

13   that violate Mr. Day's constitutional rights?

14       MR. COOK:  Same objections.

15       THE WITNESS:  I don't think I was hired to say or

16   to opine on the constitutional rights, whether they

17   were violated.

18       But where I am competent is that if a person does

19   something so far out of the norm, that that leads to --

20   and that that starts a series of events, that there's a

21   responsibility there.

22       That's what I'm now -- how that fits into the

23   constitutional question you are asking me, I don't

24   think I can answer in terms of being qualified to

25   answer that kind of question.

                                57

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                    800.697.3210

```
 1        Q.  We don't know whether that evidence exists or
 2   doesn't exist, right?
 3        A.  It's late in the game.
 4        Q.  If it's not there, it's not there, right?
 5        A.  I suppose so.
 6        Q.  It's total speculation.
 7        A.  That sure can be re-examined some way or
 8   another.  I don't know.
 9        Q.  Okay.  Let's go back to page 5 of your report.
10   And the third thing you've listed under next is quote,
11   "Failure to notify the Communications Division of the
12   situation at hand throughout this incident."
13        Okay.  Do you believe that Patzer's failure to do
14   so constitutes a constitutional violation?
15        MR. COOK:  Same objection as before.  Calls for a
16   legal opinion.  Lacks foundation.  It's beyond the
17   scope of the expert's designation.
18        THE WITNESS:  Well, I think if you ask the
19   question on every one of those points, the answer would
20   be the same because, again, I'm not a lawyer.
21        I just know that these are very serious departures
22   from what we would expect from a reasonably trained
23   officer and they are unexplained.
24        MR. FITZGERALD:
25        Q.  With regard to the failure to notify the
```

65

1    Communications Division of the situation at hand

2    throughout the incident, how did that contribute in any

3    way to Mr. Day being shot?

4         A.  Well, we will never know, will we.

5         Q.  Okay.

6         A.  Because having confidence in officers rolling

7    to the scene, knowing that other officers are -- can

8    roll to contain, in my view what would have been

9    natural here was that he would have broken off the foot

10   pursuit.  And none of that would have happened.

11        Q.  So is it kind of your view here that he should

12   have just let him run away?

13        A.  Well, of course.  What else can he do?  He has

14   to stay with his partner.  He has two in the car.  He

15   has the car.

16        And the only option is he is going to separate

17   from his -- from this and go chase after one.

18        Q.  Okay.

19        A.  And of course you are going to let him go.

20        Q.  You weren't concerned -- you are aware of the

21   fact that one of the things Mr. Day did was try to

22   break into somebody's house.

23        MR. COOK:  Objection.  That calls for speculation.

24   Lacks foundation.

25        MR. FITZGERALD:

                              66

1    information then --

2        Q.  Are you prepared to testify about anything we

3    haven't talked about?

4        A.  I am prepared to talk about anything you've

5    asked me.

6        Q.  Okay.  That's a good segue into my last area

7    of questioning.  Have you, yourself, ever been involved

8    in an officer-involved shooting?

9        A.  I have.

10       Q.  And when was that?

11       A.  It was in 1970.

12       Q.  And tell me what happened.

13       A.  What happened was I was a detective assigned

14   in San Dimas.  And the suspect was a burglary suspect.

15       We had tracked him to his -- where he was staying.

16   He was not there.

17       We had warrants for his arrest but his girlfriend

18   was there, who agreed to show us where he was.

19       He was at a bar in Pomona.  Upon our approach to

20   the bar, he spotted the undercover car and started

21   running.

22       My partner -- this was a detective car -- let me

23   out.  I chased after him to keep him in sight, knowing

24   that he would -- and he told me he would encircle and

25   get Pomona to saturate the area.

91

1     My sole responsibility was to keep him in sight so

2   we would know where he was going.

3     There were no such things as handheld radios in

4   those days.  And he disappeared.

5     When I came around the corner, he was waiting for

6   me with a handgun pointed at me.

7     I was caught in the open.  I couldn't get to him

8   and I could not get back in time for him to pull the

9   trigger.

10     He had misfired.  It was a .25 caliber Mauser.  I

11   told him to drop the gun.

12     He used some language and put the gun up to -- and

13   put his hand on the slide and was pulling the slide

14   back to eject out the bad round and reload.  And I shot

15   him twice.

16     Q.  Did he survive?

17     A.  He died.

18     Q.  Any litigation as a result of that?

19     A.  None.

20     Q.  Did anybody criticize what you did in any way?

21     A.  No.  There were a number of witnesses.  All

22   the remaining ammunition worked perfectly and the gun

23   worked perfectly in the lab.

24     Q.  Okay.  The way you described that, in your

25   opinion was your conduct any different than what you've

92

1    described as quote, "dangerous and reckless behavior"

2    as quote "Tombstone Courage" end quote, and identifies

3    departures from the required tactics as quote, "Fatal

4    Error" end quote, as you refer to it on page 3 of your

5    report?

6         A.   I think it is very different.

7         Q.   How is it different?

8         A.   Well, I was not -- my intent was not to do the

9    apprehension but to keep him in sight so that I would

10   be able to eventually communicate, either with an

11   officer who had come up to the scene or reconnect with

12   the partner, where he was.

13        He was a burglary suspect.  Some of the things

14   that were taken were guns.  I didn't have the intention

15   of physically tackling him.

16        In fact, in those days I could run like a gazelle.

17   I could have outrun him easily and I was not tired or

18   winded or anything like that.

19        The aspect of communications was decidedly

20   different but --

21        Q.   In what way?

22        A.   Because the only radio was in the car and it

23   was only two channels.

24        So -- and my partner who -- my partner detective

25   was busy on that radio getting everybody in as would be

                              93

          HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                           800.697.3210

1    required.

2    .    There were helicopters but they were rare but he

3    was trying to do that.

4        So the containment piece, getting on the radio,

5    notifying Pomona, we were the City of Pomona Sheriff's.

6    Getting all that done was falling into place and even

7    then things can go badly.

8        Q.  How much time elapsed --

9        A.  And, I might add, he had a weapon and he

10   deliberately tried to use it.

11       And he would not -- and I followed the warning,

12   gave him a chance, and I shot him because there was

13   nothing else.

14       I couldn't get out of the kill zone.  And I

15   couldn't -- my mistake was not expecting -- expecting

16   him to continue to run rather than to do the ambush.

17       But I couldn't get to him to get at the gun and I

18   couldn't get out of the way.  So --

19       Q.  When you were looking for this burglar, was he

20   described as armed and dangerous?

21       A.  No.

22       Q.  Okay.  How much time elapsed from the time

23   when you left the car until the time when he pulled the

24   gun on you approximately?

25       A.  Well, we ran about a mile.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210