United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHAWN DAY,

           Plaintiff,

    v.

COUNTY OF CONTRA COSTA, et al.,

           Defendants.

_____/

No. C 07-4335 PJH

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment came on for hearing before this court on September 10, 2008.  Plaintiff appeared by his counsel Thom Seaton and Larry E. Cook, and defendants appeared by their counsel Noah G. Blechman and James V. Fitzgerald III. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion.

**BACKGROUND**

Plaintiff Shawn Day filed this wrongful death and police excessive force case on his own behalf and as the successor in interest to the Estate of Steffan Matthew Day ("decedent" or "Steffen Day" or "Day").  Defendants are the County of Contra Costa; Warren Rupf, the Sheriff of Contra Costa County; and Joshua Patzer, a Deputy Sheriff employed by Contra Costa County.

On August 15, 2006, Steffen Day, who was 17 years old, was driving a Ford Mustang with two passengers in the Bay Point area of Contra Costa County.  Deputy Sheriff Jason Vorhauer was driving a marked Sheriff's patrol vehicle in which Deputy Patzer was a passenger.  Both deputies were in full uniform.

United States District Court

For the Northern District of California

1    At approximately 1:45 a.m., the two deputies spotted the Mustang and a pickup

2    truck that was tailgating the Mustang.  Both vehicles were being driving erratically.  Deputy

3    Vorhauer drove the patrol car behind the two vehicles so that the deputies could observe

4    more closely.  The two vehicles continued to move erratically.  Deputy Patzer attempted to

5    run the license plate of the pickup truck, but was unable to see the rear license plate

6    because of the position of the bumper.  As the patrol car approached the truck, the driver

7    began to drive lawfully.  However, the driver of the Mustang continued to drive erratically

8    and also sped up and made a right-hand turn.  Officer Vorhauer followed the Mustang.

9    The Mustang and the patrol car made two turns, and the Mustang came to a

10   temporary stop.  Both deputies noticed that the trunk of the Mustang did not have a lock.

11   They believed that this was indicative of a lock that had been "punched," a common

12   technique used by car thieves.  Deputy Patzer attempted to run the license plate, to

13   determine whether the Mustang was stolen.  After the brief stop, the driver of the Mustang

14   took off again.

15   Before Deputy Patzer was able to confirm whether the Mustang was stolen, the

16   driver pulled into the driveway of a house located at 36 Galleon Way in Pittsburg.  Both

17   deputies activated their side spotlights in order to illuminate the area.  Both deputies

18   noticed "furtive movements" by the Mustang's three occupants.  They also noticed that the

19   two front passengers appeared to be handing items to the passenger in the back seat.

20   Both deputies exited the patrol car and approached the Mustang – Deputy Patzer on

21   the passenger side, and Deputy Vorhauer on the driver's side – both carrying flashlights.

22   Deputy Patzer looked into the Mustang and saw that there was no key in the ignition on the

23   steering column (although the engine was idling), which further suggested that the Mustang

24   was stolen.  From his perspective, Deputy Vorhauer noticed glass on the floorboard on the

25   driver's side, and a "center punch" tool in the center console area.  Deputy Vorhauer knew

26   that there is typically broken glass in a stolen vehicle, because of the forced entry, and that

27   a "center punch" tool is a metal object often used to break windows.

28   Deputy Patzer informed Deputy Vorhauer that there was no key in the ignition.

2

United States District Court

For the Northern District of California

Deputy Vorhauer told the driver, Steffen Day, to turn off the ignition, but Day stated that he was unable to do so.  Deputy Vorhauer interpreted this as additional evidence that the vehicle had been stolen.  At about the same time, Deputy Patzer pulled out his weapon, and held it in the "low ready" position behind his leg, as he was fearful for his safety at that point and believed the Mustang had been stolen.  One of the vehicle's occupants attempted to open the passenger door, but Deputy Patzer pushed the door shut.

Deputy Patzer ordered the front passenger to place his hands on the dashboard, and the back passenger to place his hands on the headrest.  The occupants of the Mustang did not immediately comply with the request to keep their hands in plain sight, but eventually did.

During this time, Deputy Vorhauer was attempting to get the driver, Steffen Day, to exit the Mustang.  Deputy Vorhauer states that it was his normal practice in such situations to "trap" the driver between the car and the door.  In this case, however, because Day could not turn the Mustang's ignition off, and because Deputy Vorhauer did not want Day to get back in the car and take off, potentially putting the two deputies at risk of injury or death, he asked Day to step around the door towards the front left panel of the Mustang.  Deputy Vorhauer's intent was to get Day away from the vehicle and pat search him for weapons.  Day then stepped around the door and Officer Vorhauer followed him towards the front of the Mustang.

Deputy Patzer was still attempting to get the two passengers to keep their hands in plain sight.  He noticed that the rear passenger had dropped his hands from the headrest, and they were no longer in sight.  Deputy Patzer believed this to be an officer safety issue, as he did not know whether there were any weapons in the vehicle, and could no longer see the rear passenger's hands.  He again told the passenger to place his hands on the headrest.

Meanwhile, as Day got to the front left panel of the vehicle, he started running around the front of the vehicle towards and past Deputy Patzer, between the Mustang and the garage door.  Deputy Patzer saw Day running, looked back at the Mustang, and saw

3

United States District Court

For the Northern District of California

1  that the front passenger was again attempting to open the door.  Deputy Patzer used his

2  foot to kick the door closed.  He then put his weapon back in the holster, and gave chase

3  after Day, as he was now closer to Day than Deputy Vorhauer was.

4        Deputy Patzer yelled, "Foot pursuit," indicating to Deputy Vorhauer that he was

5  proceeding in pursuit of Day.  Deputy Patzer believed that Deputy Vorhauer had not yet

6  conducted a pat search of Day, and so did not know whether Day was carrying any

7  weapons.  Deputy Vorhauer remained with the other two passengers in the Mustang.  He

8  did not know whether they had any weapons.

9        Deputy Patzer saw Day jump the wall between the house at 36 Galleon Way and the

10  adjacent house at 30 Galleon Way, and saw him fall after the jump.  Deputy Patzer then

11  jumped up on top of the wall, watched Day run off, and jumped down.  He pulled out his

12  flashlight, as the area in which he had landed was very dark.

13        Deputy Patzer chased Day through some bushes along the side of the 30 Galleon

14  Way property.  He shined the light toward Day, and saw that he was attempting to get into

15  the front door of the residence.  Deputy Patzer did not know whether Day knew the

16  occupants of the house, or whether he was just continuing his attempt to flee.  He

17  continued to chase Day back out onto the street, as Day moved toward the next house

18  down the street, 26 Galleon Way.

19        Officer Patzer yelled, "Stop!  Sheriff's Office!  Police!  Stop!" – or words to that effect

20  – several times, but Day continued to flee.  As Officer Patzer chased Day toward the next

21  house, Day ran toward the front door of that residence, but suddenly turned toward the

22  right and jumped on the nearby fence.  As Day jumped on the fence, Deputy Patzer caught

23  up with him and grabbed his shoulders to pull him back down so he could control and

24  handcuff him.  However, the fence was actually a gate, which gave way and opened.  This

25  caused Deputy Patzer to fall forward to the ground onto his knees and to drop his flashlight.

26  At that point, there was no light in the yard area.

27        Deputy Patzer and Day were in a narrow side yard, next to a house.  The yard

28  contained substantial amounts of trash and debris.  As Deputy Patzer was attempting to

United States District Court

For the Northern District of California

1  stand up, he was hit hard on the left side of his head/face.  This caused him to stumble

2  backward, and dazed him somewhat.  He was having difficulty seeing, as the yard area

3  was very dark.  He could not locate his flashlight, which was partially buried under the

4  debris.

5  Deputy Patzer believes it was Day that hit him, stating in his declaration, "As I was

6  attempting to stand back up and to locate my flashlight, I was hit in the face by Day, it felt

7  like a fist punch to the left side of my head, which caused me to stumble backwards and

8  dazed me."  However, plaintiff speculates that as Deputy Patzer was rising to his feet, he

9  hit his head on a square air conditioner unit that was sticking out from a window,

10 approximately three feet in from the gate the two men had fallen through.

11 Deputy Patzer moved forward to grab Day to prevent him from running, but instead

12 of grabbing Day from behind, as he had anticipated, he made contact with Day's shoulders

13 because  Day was facing him.  Day continued to punch and take swings at Deputy Patzer,

14 who ducked his head between his arms to avoid being hit in the face or head.  Day also

15 started to push Deputy Patzer backwards.  Some of Day's blows were making contact with

16 Deputy Patzer's head and shoulders.  Deputy Patzer then pushed Day away, hoping that

17 this would stop the assault.

18 Because of all the debris in the yard, Deputy Patzer was slipping around and having

19 trouble gaining solid leverage.  As Deputy Patzer regained his balance, Day once again

20 moved on top of him, causing Deputy Patzer to fall down in a pile of debris and trash.  It

21 was so dark in the side yard that Deputy Patzer could see only Day's silhouette, and could

22 not see his hands or whether he had a weapon in his hands or in his waistband.  As Deputy

23 Patzer fell down again, his right arm went through a pile of trash and he held his left arm up

24 to try to protect himself from Day, who was on top of him and was aggressively swinging at

25 him.

26 Deputy Patzer used his legs to push off the ground and get up again.  He expected

27 Day to run away at that point, and states that "that was okay with me," as he was still dazed

28 from the original blow to the head, and Day had been on top of him twice, and had been

United States District Court

For the Northern District of California

1   overpowering him.  Deputy Patzer was willing to let Day run away if that would stop the

2   violent assault.  Instead of fleeing, however, Day came back again at Deputy Patzer,

3   swinging in an aggressive manner.  Deputy Patzer put his left hand up to protect himself,

4   and put his other hand on his duty weapon.

5        As Day was pushing him backwards, Deputy Patzer felt something hit him from

6   behind, in the middle of his back.  He feared that this might be an ambush from either the

7   other passengers in the Mustang, or friends of Day from a nearby house.  Day continued

8   pushing Deputy Patzer backward, punching and hitting him.  Deputy Patzer believed his life

9   was in danger because he was convinced that Day was going to get on top of him again.

10  He grabbed his weapon, and tried to step back and bend down a little bit.

11       Deputy Patzer fired one shot in the direction of Day with his arm bent backwards,

12  close to his body and away from Day, in what he states is known in the law enforcement

13  field as the "retention position."  According to Deputy Patzer, this position is used by

14  officers in situations when they are being assaulted, and/or to prevent a suspect from

15  grabbing an officer's weapon.  Deputy Patzer did not have a taser with him at the time, and

16  states that he could not have used a baton or pepper spray because he was so close to

17  Day, because he could not see clearly, and because Day was being so aggressive in his

18  attacks.  When Deputy Vorhauer, who was still back at the Mustang guarding the

19  passengers, heard the gunshot, he pulled out his firearm and pointed it at the two

20  passengers.

21       Immediately after Deputy Patzer fired his weapon, the force exerted on him by Day

22  stopped.  However, the force of the gunshot also made Deputy Patzer's foot slip out on the

23  ground so that he had again to regain his balance.  At first, he believed that Day had run

24  off.  He then saw his flashlight lying on the ground under some debris to his left.  He kicked

25  the debris aside and picked up the flashlight and shined it behind him to see who or what

26  had slammed into him.  He saw a square external air conditioner unit hanging out of the

27  window of the house.  He later concluded that it had been the air conditioner that had hit

28  him in the back as Day had been forcing him backwards.

**United States District Court**
For the Northern District of California

1    Deputy Patzer shined the flashlight in front of him and noticed Day lying on the

2    ground, attempting to get up.  He yelled, "Sheriff's Office!  Stay on the ground!  Don't get

3    up!" – or words to that effect.  He had both his weapon and flashlight pointed at Day at this

4    point.  He was feeling physically exhausted because of the struggle with Day.

5    When Deputy Patzer noticed that Day was bleeding, he got on his radio and asked

6    for a "Code 3 cover," which is a request for officers to come to the scene urgently with

7    lights and sirens to assist.  He also asked dispatch to send fire and ambulance for Day.  He

8    informed dispatch that shots had been fired and that the suspect was down, and gave them

9    the number of the house.  Officer Vorhauer, who was waiting to hear what was going on

10    from Deputy Patzer, heard the call to dispatch.

11    At that point, Deputy Patzer did not know what Deputy Vorhauer was doing with the

12    two passengers, or whether the passengers were armed, or possibly fighting with Officer

13    Vorhauer, or attempting to flee.  After Deputy Vorhauer heard Deputy Patzer place the call

14    to dispatch, he handcuffed the passengers and went to find Deputy Patzer to ask what had

15    happened.  Deputy Patzer told Deputy Vorhauer that Day had been on top of him and had

16    been hitting him.  Deputy Vorhauer could see a large fresh bump or knot on the left side of

17    Deputy Patzer's forehead.

18    Other officers arrived soon thereafter, and both Deputy Patzer and Deputy Vorhauer

19    were sequestered and placed in a Sheriff's Office patrol car while the other officers took

20    control of the scene.  Before Deputy Patzer was sequestered, he assisted in moving some

21    of the trash and debris away so the gate could be fully opened and to create a path for

22    medical personnel and other officers.  Deputy Patzer concluded that the side yard gate was

23    not meant to be opened, as it was apparent that the trash and debris had accumulated

24    behind the gate for a long period.

25    Deputy Vorhauer estimated that the entire incident from the time that the deputies

26    stopped their patrol car until Officer Patzer shot Day lasted less than two minutes, and also

27    estimated that it was 30-40 seconds from the time that Day ran away that he heard the

28    single gunshot.  Deputy Patzer estimated that the time from when Day started struggling

**United States District Court**

For the Northern District of California

1   with him in the side yard after they had gone over the fence, until the time that he fired his

2   weapon at Day, was about 15-20 seconds.

3        Day was taken to the hospital in an ambulance, where he was pronounced dead at

4   2:55 a.m.  Dr. Brian Peterson, a forensic pathologist, performed an autopsy several hours

5   later.  The cause of death was internal bleeding because of the gunshot wound.  The bullet

6   came in through the front of decedent's body, went through his abdominal wall and severed

7   a key artery, and then lodged in his pelvis.  At the time of his death, decedent was

8   approximately 5'11" and weighed 178.5 pounds.  On the date of the incident, Deputy Patzer

9   was 5'11" and weighed between 180 and 190 pounds.

10        Dr. Peterson found fresh scratches on the back of decedent's right hand, which were

11   consistent with being in a struggle and punching.  He also found a fresh brush-type

12   abrasion in the middle of decedent's forehead, and a fresh abrasion on decedent's chest

13   that matched a pattern of contact with a fence.

14        Per Dr. Peterson's request, decedent's bodily fluids were tested for toxicological

15   results.  A significant amount (0.55 micrograms per ml.) of methamphetamine was detected

16   in decedent's system at the time of his death.  According to Dr. Peterson, it is generally

17   accepted in the medical community that a methamphetamine level greater than 0.55 is

18   deemed a "lethal" level, and decedent's level was above that.  Dr. Peterson believed that it

19   was likely that decedent had a higher level of methamphetamine in his system at the time

20   of the shooting, and that the level had been diluted during the introduction of intravenous

21   fluids for the emergency medical treatment.

22        Decedent also had an amphetamine level of 0.04 micrograms per ml., which,

23   according to Dr. Peterson, means that only a small amount of the ingested

24   methamphetamine had actually been metabolized.  This indicated, according to Dr.

25   Peterson, that decedent had used methamphetamine shortly before his death.  Overall, Dr.

26   Peterson concluded, decedent had used a large dose of methamphetamine shortly before

27   his death.

28        Following the incident, Sheriff Rupf investigated, and determined that Deputy

United States District Court

For the Northern District of California

1   Patzer's use of force was not improper, and declined to take disciplinary action.

2          Plaintiff filed this action on August 22, 2007, asserting five causes of action:

3   (1) violation of decedent's Fourth Amendment right to be free from excessive force, alleged

4   against Deputy Patzer; (2) violation of plaintiff's Fourteenth Amendment right to maintain a

5   parental relationship with decedent, alleged against Deputy Patzer; (3) violation of plaintiff's

6   and decedent's rights under the Fourth Amendment, alleged against Sheriff Rupf, for failure

7   to train and supervise Deputy Patzer with regard to the appropriate use of force; (4)

8   wrongful death, against all defendants; and (5) violation of decedent's civil rights, alleged

9   under California Civil Code § 52.1, against Deputy Patzer and the County.

10                                        **DISCUSSION**

11   A.     Legal Standard

12          Summary judgment is appropriate when there is no genuine issue as to material

13   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

14   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

15   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

16   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

17          A party seeking summary judgment bears the initial burden of informing the court of

18   the basis for its motion, and of identifying those portions of the pleadings and discovery

19   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

20   v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

21   at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

22   than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

23   888 (9th Cir. 2003).

24          On an issue where the nonmoving party will bear the burden of proof at trial, the

25   moving party can prevail merely by pointing out to the district court that there is an absence

26   of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

27   moving party meets its initial burden, the opposing party must then set forth specific facts

28   showing that there is some genuine issue for trial in order to defeat the motion.  See Fed.

United States District Court

For the Northern District of California

1  R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

2      "A scintilla of evidence or evidence that is merely colorable or not significantly

3  probative does not present a genuine issue of material fact" precluding summary judgment.

4  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000); see also Summers v.

5  Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  On summary judgment the court

6  is not to weigh the evidence or determine the truth of the matters asserted but must only

7  determine whether there is a genuine issue of material fact that must be resolved by trial.

8  See Summers, 127 F.3d at 1152.  Nonetheless, in order for any factual dispute to be

9  genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in

10  order to defeat a defendant's summary judgment motion.  Addisu, 198 F.3d at 1134.

11  B.    Defendants' Motion for Summary Judgment

12      Defendants make four arguments in support of their motion.  First, they assert that

13  Deputy Patzer is entitled to qualified immunity.  Second, they contend that Deputy Patzer's

14  use of deadly force did not violate plaintiff's Fourteenth Amendment right to maintain a

15  parental relationship.  Third, they argue that the claims against Contra Costa County must

16  be dismissed because plaintiff cannot establish municipal liability.  Fourth, they contend

17  that plaintiff's state law claims fail because Deputy Patzer acted in accordance with the

18  Fourth Amendment; and because Deputy Patzer and the County are entitled to immunity

19  under the California Government Code.

20      1.    Whether Deputy Patzer is entitled to qualified immunity

21      Defendants argue that Deputy Patzer is entitled to qualified immunity.  The defense

22  of qualified immunity protects "government officials . . . from liability for civil damages

23  insofar as their conduct does not violate clearly established statutory or constitutional rights

24  of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818

25  (1982).  Qualified immunity involves a two-part inquiry.  Saucier v. Katz, 533 U.S. 194, 201-

26  02 (2001).  The initial question is whether the facts, taken in the light most favorable to the

27  party asserting the injury, show that the officer's conduct violated a constitutional right.  Id.

28  at 201.

**United States District Court**

For the Northern District of California

1    Thus, when qualified immunity is asserted in a motion for summary judgment, the

2    first step in the analysis is to consider the materials submitted in support of and in

3    opposition to the motion, "in order to decide whether a constitutional right would be violated

4    if all facts are viewed in favor of the party opposing summary judgment." Jeffers v. Gomez,

5    267 F.3d 895, 909 (9th Cir. 2001).  The issue is not whether a claim is stated for a violation

6    of plaintiff's constitutional rights, but rather whether the defendants actually violated a

7    constitutional right.  Martin v. City of Oceanside, 360 F.3d 1078, 1082 (9th Cir. 2004).

8    In the excessive force context, this means that the court must inquire into the

9    objective reasonableness of the officer's belief in the necessity of his actions.  Wilkins v.

10   City of Oakland, 350 F.3d 949, 954-55 (9th Cir. 2003).  Although "reasonableness

11   traditionally is a question of fact for the jury," a defendant can prevail on summary judgment

12   if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the

13   officer's use of force was objectively reasonable under the circumstances."  Scott v.

14   Henrich, 39 F.3d 912, 915 (9th Cir. 1994).

15   If no constitutional right would have been violated were the allegations established,

16   there is no necessity for further inquiries concerning qualified immunity.  Saucier, 533 U.S.

17   at 201.  If, on the other hand, a violation could be made out on a favorable view of the

18   parties' submissions, the next step for the court is to determine whether the right was

19   clearly established – that is, whether it would be clear to a reasonable officer that his

20   conduct was unlawful in the situation he confronted.  Id.  If the law did not put the officer on

21   notice that his conduct would be clearly unlawful, summary judgment based on qualified

22   immunity is appropriate.  Id.

23   "The question is what the officer reasonably understood his powers and

24   responsibilities to be, when he acted under clearly established standards."  Id. at 208.  In

25   the excessive force context, this step involves an inquiry into the objective reasonableness

26   of the officer's belief in the legality of his actions.  Wilkins, 350 F.3d at 954-55.  "If the law

27   did not put the officer on notice that his conduct would be clearly unlawful, summary

28   judgment based on qualified immunity is appropriate."  Saucier, 533 U.S. at 202.

United States District Court

For the Northern District of California

1    If the officer was mistaken as to what the law requires, but that mistake was

2 reasonable, the officer is still entitled to the immunity defense.  Id. at 205.  In other words,

3 "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if

4 constitutionally deficient, reasonably misapprehends the law governing the circumstances

5 [he] confronted."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citing Saucier, 533 U.S.

6 at 206).

7    All claims of excessive force are analyzed under the "objective reasonableness"

8 standard of the Fourth Amendment set forth in Tennessee v. Garner, 471 U.S. 1 (1985)

9 and Graham v. Connor, 490 U.S. 386 (1989).  See Blanford v. Sacramento County, 406

10 F.3d 1110, 1115 (9th Cir. 2005).

11    In Garner, the Supreme Court for the first time considered the constitutionality of the

12 common law rule permitting the use of deadly force to prevent the escape of a fleeing felon.

13 The Court held that it was unreasonable under the Fourth Amendment for an officer to

14 "seize an unarmed, nondangerous suspect by shooting him dead," but that "[w]here the

15 officer has probable cause to believe that the suspect poses a threat of serious physical

16 harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

17 escape by using deadly force."  Garner, 417 U.S. at 11.

18    Moreover, "if the suspect threatens the officer with a weapon or there is probable

19 cause to believe that he has committed a crime involving the infliction or threatened

20 infliction of serious physical harm, deadly force may be used if necessary to prevent

21 escape, and, where feasible, some warning has been given."  Id. at 11-12.  The question in

22 Garner was

23    whether, to justify the use of deadly force, an officer must believe only that a
        suspect is fleeing or also that the suspect represents a serious and immediate
24      threat to the officer or others.  In either case, the Court assumed that the
        belief would have to be reasonable, an inquiry that under the Fourth
25      Amendment always depends upon objective factors and not upon sincerity of
        belief.
26

Price v. Sery, 513 F.3d 962, 967 (9th Cir. 2008).

27    In Graham, the Court considered whether excessive force claims should be

28

United States District Court

For the Northern District of California

1    analyzed as substantive due process claims or as Fourth Amendment claims.  The Court

2    clarified that the reasonableness inquiry turned upon the circumstances confronting the

3    officer, rather than on the officer's subjective belief or intentions.  "[T]he question is whether

4    the officer's actions are 'objectively reasonable' in light of the facts and circumstances

5    confronting them, without regard for their underlying intent or motivation."  Graham, 490

6    U.S. at 397.

7         Determining whether the force used in a particular seizure was objectively

8    reasonable "requires a careful balancing of the nature and quality of the intrusion on the

9    individual's Fourth Amendment interests against the countervailing governmental interests

10   at stake."  Id. at 396.  This balancing test involves a consideration of the totality of the facts

11   and circumstances in the particular case, including "the severity of the crime at issue,

12   whether the suspect poses an immediate threat to the safety of the officers or others, and

13   whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.  In

14   general, the reasonableness of an officer's belief as to the appropriate level of force should

15   be judged from an "on scene" perspective.  Id.

16        Here, defendants argue that under the totality of the circumstances, Deputy Patzer's

17   use of deadly force was reasonable under the Graham balancing test.  First, they assert,

18   Deputy Patzer viewed Day as a felony suspect.  They note that based on the objective

19   evidence of the Mustang's condition (the punched trunk lock, the lack of a key in the

20   ignition, and Day's statement that he could not turn the ignition off), both deputies believed

21   that they were pursuing an individual involved in a stolen vehicle crime.  In addition, they

22   assert, Day's reckless driving may have risen to a felony offence, and once he punched

23   Deputy Patzer, Day had clearly committed felony battery of a police officer.

24        Second, defendants contend, Day clearly posed an immediate threat to the safety of

25   Deputy Patzer.  They assert that there is no dispute that Day fled from the deputies on foot

26   after being initially detained.  They note that Deputy Patzer testified that after he caught up

27   to Day, Day responded by aggressively punching him in the head, dazing him, and that Day

28   continued to punch and take swings at him.  They assert that some of those punches made

United States District Court

For the Northern District of California

1  contact, while others were deflected by Deputy Patzer's defensive maneuvers.

2  Defendants also note Deputy Patzer's statements that he did not know whether Day was

3  carrying a weapon when he fled, or whether he might have obtained one during his flight;

4  that because the yard was in total darkness, he could not see Day's hands or waistband,

5  but only his silhouette; and that although he tried several times to push Day away, Day

6  continued his aggressive attacks.  Defendants contend that when Day pushed Deputy

7  Patzer into the air conditioner unit, Deputy Patzer reasonably believed there was another

8  aggressor in the yard.

9       Defendants assert that it was only after Day was hovering over and prevailing over

10  Deputy Patzer for the third time that Deputy Patzer fired his weapon.  They note that he

11  shot once, and only for the purpose of defending himself from serious bodily injury.

12  Defendants argue that because Day had such a high level of methamphetamine in his

13  system, there was a strong likelihood that he would have overpowered Deputy Patzer to

14  the point of seriously injuring or killing him.  Defendants assert that under the

15  circumstances (close contact with and attacks by Day, and the total darkness of the yard

16  area), Deputy Patzer had no ability to use other force options.  He feared for his life, and

17  fired his weapon (in a retained position) to attempt to ward off the assault by Day.

18       Third, defendants argue, Day was at all times attempting to evade arrest – initially by

19  fleeing over the fence and around the adjoining house, and then by physically attacking

20  Deputy Patzer.  They note that although Deputy Patzer warned Day to stop running, and to

21  stop resisting, the attacks did not stop until Deputy Patzer fired his weapon.

22       Defendants contend in addition that even if the court finds that there is a triable issue

23  as to whether Deputy Patzer violated Day's Fourth Amendment rights, the court should still

24  find that he is entitled to qualified immunity because it was not clearly established that it is

25  unlawful for an officer to shoot a violently aggressive resistive person, who is winning in a

26  hand-to-hand struggle with that officer.  Defendants argue that plaintiff can point to no case

27  in which a court has ruled that an officer cannot use deadly force when being attacked and

28  threatened by a suspect in a dark and confined space.  In addition, they assert that it is not

United States District Court

For the Northern District of California

1  clearly established that shooting at a repeatedly attacking felony suspect, who is winning

2  the fight with the officer, who may be armed, and who may not be the lone aggressor, is a

3  Fourth Amendment violation.

4       Moreover, defendants contend, even if plaintiff could show that the law was clearly

5  established that Deputy Patzer's actions were unconstitutional, a reasonable officer in

6  Deputy Patzer's situation could have believed that his use of deadly force to stop Day was

7  lawful.  They assert that even if Deputy Patzer were mistaken regarding the legality of his

8  actions, his mistake was reasonable given the rapid and uncertain course of events.  At a

9  minimum, defendants contend, Deputy Patzer's conduct fell within the "hazy border

10  between excessive and acceptable force," Saucier, at 206, entitling him to qualified

11  immunity.

12       In opposition, plaintiff argues that Deputy Patzer is not entitled to qualified immunity

13  because substantial evidence exists that his use of deadly force was not objectively

14  reasonable.  Plaintiff asserts that Day was unarmed, and that while it is true that he fled

15  from a vehicle that may have been stolen, the vehicle's status had not been confirmed.

16  Plaintiff argues further that while Deputy Patzer claims that Day had punched him in the

17  head and assaulted him three times before he fired his weapon, the photographs of Deputy

18  Patzer taken after the incident and supplied by defendants show no serious injuries, just a

19  few scratches.

20       Plaintiff claims that the precise event that precipitated the shooting was Deputy

21  Patzer's collision with the air conditioner, which he mistook for an attack by one of Day's

22  confederates.  Plaintiff argues that sincerely held but unreasonable belief does not justify

23  the use of force under Garner, Graham, or Ninth Circuit precedent.  Plaintiff contends that a

24  simple statement by an officer that he feared for his safety or the safety of others is not

25  sufficient to justify the use of force, in the absence of objective factors.  Plaintiff claims that

26  Deputy Patzer committed a constitutional violation by shooting Day when he was under no

27  threat of physical harm or death.

28       Plaintiff also asserts that given the factual conflicts and the competing inferences in

15

United States District Court

For the Northern District of California

the record, the court may not find as a matter of law that no constitutional violation occurred.  In opposing defendants' motion, plaintiff relies heavily on a declaration by Roger Clark, his "police procedures" expert.

Among other things, Mr. Clark opines that "Deputy Patzer's use of deadly force was objectively unreasonable even if Deputy Patzer's recollection of events is entirely accurate." He describes the decision to chase Day as a "Fatal Error," which he defines as "a deliberate reckless and dangerous action by a police officer or deputy sheriff which place[s] both the officer and civilians at grave risk of unnecessary harm or death."  He contends that this decision was "particularly reckless given the Deputies' failure to confirm by computer that the Ford Mustang had been stolen and the absence of information that Day, if not apprehended, posed a risk of serious physical harm to anyone."

Plaintiff claims that the record raises numerous questions that must be answered before any determination can be made as to the reasonableness of Deputy Patzer's actions.  First, plaintiff asserts that Deputy Patzer's physical and mental condition might have been a factor in his use of deadly force, because it might have caused him to believe he was under a threat of severe harm when he was not.  Plaintiff notes that Deputy Patzer states in his declaration he was exhausted by the struggle, and that he testified in his deposition that he had worked a double shift that day.

Second, plaintiff questions whether Deputy Patzer suffered any serious physical harm at the hands of Day prior to the shooting.  Plaintiff asserts that the photographs of Deputy Patzer and his clothing show abrasions on his knee, could easily have been caused by the fall through the fence; scratches on the hand, which may well have occurred when he ran through the bushes in pursuit of Day or when he pushed his hand through the rubble in the yard as he tried to get up; and abrasions on his back, which might have resulted from his backing into the air conditioner.

Third, plaintiff claims that the bump on the head "likely occurred" when Deputy Patzer struck his head on the air conditioner when he rose to his feet after falling over the fence.  Plaintiff points to the August 16, 2006, interview conducted by a Detective A.

16

United States District Court

For the Northern District of California

Deplitch, in which Deputy Patzer allegedly told Sgt. Gary Clark at the scene that he had hit his head on the air conditioner.  Plaintiff suggests that the fact that Deputy Patzer stated in an interview taken the following day that he wasn't sure what he hit his head on, but believed that Day had hit him (based on the fact that when he tried to grab Day, Day was facing him) raises disputed issues that preclude summary judgment.

In support of the argument that Patzer likely hit his head on the air-conditioner, plaintiff also provides declarations from Henry Martin and his wife Sonja Martin, who live in a house located at 37 Dolphin Drive, which backs up against the property at 26 Galleon Way, where the incident occurred.

Henry Martin states that he was sleeping, and at 1:56 a.m. his wife (watching TV in bed) woke him to tell him "something strange was going on outside."  Henry Martin heard what the thought were two shots, and looked out the window.  He claims to have seen two male figures in the back yard of 26 Galleon Way – one man was "doubled over on the ground," and the second, a sheriff's deputy, "standing approximately 5 to 6 feet away from the other male holding a gun in one hand and a flashlight in the other."  He claims that "[t]he deputy ordered the other man to lie on the ground and then pushed him down," and that "[t]he man toppled over onto his side."

Sonja Martin states that she heard noises at 1:56 a.m. coming from outside the house in the direction of 26 Galleon Way.  She says that at first, she thought she heard two shots.  She then woke her husband.  As soon as he was awake, she thought she heard two more shots.

On the evening of the following day, Henry and Sonja Martin went over to investigate the scene of the shooting.  Henry Martin says that he noticed that the side entry gate, which normally opened outward, had been forced open inward and that it was broken off its hinges.  He also noticed that there was an air-conditioning unit protruding from the wall adjacent to the gate.  Based on his inspection, and what he had heard at the time of the shooting, he "came to believe that the original banging sound" that he had heard "was in fact the breaking of the gate and/or someone or something running into the gate and the air

United States District Court

For the Northern District of California

1   conditioner almost simultaneously."  He believes that the final loud bang he heard was the

2   gunshot.

3        Sonja Martin says she observed that the side yard gate had been broken off its

4   hinges, and that an air-conditioning unit protruded from the wall adjacent to the gate and

5   fence.  After discussing the incident with her husband, she decided that the noises she

6   heard were "those of the gate breaking down and possibility [sic] someone running into the

7   air-conditioning unit."  She believes that "the last loud bang" she heard was a gunshot.  She

8   claims not to have heard any voices prior to the shooting, but did hear someone yell "Get

9   down!" after what she believes was the gunshot.

10       Fourth, plaintiff asserts that it is far from clear that Day landed anything except

11  "glancing blows" or inflicted any serious harm, and also questions whether Day was

12  prevailing in the struggle, Officer Patzer's testimony notwithstanding.  Plaintiff notes that

13  Day and Officer Patzer were the same height and approximately the same weight.  He

14  claims that Deputy Patzer sustained no physical harm from Day, and asserts that a

15  comparison between the medical examiner's description of Day and the photographs of

16  Patzer fail to show that Day had gained the upper hand.  He also notes that Dr. Patterson

17  stated that the bullet took a downward trajectory, and contends that a rational jury could

18  determine that Patzer was actually standing over Day when he fired.

19       Fifth, plaintiff contends that while defendants claim that Deputy Patzer gave Day

20  several opportunities to flee, no evidence exists that he actually verbally communicated that

21  intent.  Plaintiff contends that the fact that Patzer pushed Day back does not necessarily

22  mean that he gave Day a signal that he was free to leave.  Plaintiff also asserts that when

23  Patzer shot Day, Patzer was standing near the air conditioner and Day was coming south,

24  toward the gate they had previously fallen through.  Thus, according to plaintiff, Patzer was

25  between Day and the gate.  Plaintiff asserts that a jury could reasonably conclude that Day

26  was attempting to flee from the dark, rubble-strewn yard, but was blocked by Patzer.

27       Sixth, plaintiff questions whether Deputy Patzer could have resorted to other, non-

28  lethal, means of self-defense.  He asserts that while Deputy Patzer was armed with a baton

18

United States District Court

For the Northern District of California

and pepper spray, he didn't consider using them, and also notes that there is no evidence that Day attempted to grab Deputy Patzer's weapon.  He contends that only a jury can decide whether Deputy Patzer could reasonably have used other means of force.

Finally, he questions whether Deputy Patzer had sufficient knowledge of any crime plaintiff might have committed to have considered him a serious threat.  Plaintiff contends that, at most, Deputy Patzer knew that Day might be a car thief, but had received no confirmation of that suspicion, and argues that Day was unarmed and that Deputy Patzer could not have known that Day had ingested methamphetamine.

The court finds that summary judgment must be GRANTED as to qualified immunity. The objective evidence shows that Deputy Patzer's concern for his personal safety justified his use of deadly force, and that Deputy Patzer had probable cause to believe that Day posed "a threat of serious physical harm."  See Garner, 471 U.S. at 11.    It is undisputed that Deputies Patzer and Vorhauer had reason to suspect that the Mustang was stolen, that the deputies followed the Mustang, that the Mustang pulled into the driveway of the house at 30 Galleon Way, and that Deputy Vorhauer told Day to exit the vehicle.  It is undisputed that Day ran off, and that Deputy Patzer pursued him.

It is also undisputed that Deputy Patzer and Day climbed over and/or knocked down a gate in a fence; that they engaged in a scuffle in the darkened side yard of the house at 26 Galleon Way; that there was considerable amount of trash and debris in the yard; that Day continued both to resist arrest and to attack Deputy Patzer; that Day was under the influence of a considerable amount of methamphetamine; and that Deputy Patzer suffered scrapes and abrasions on his body and a bump on his head as a result of the incident.

What plaintiff disputes is the amount of injury inflicted on Deputy Patzer by Day; whether Day hit Deputy Patzer on the head, or Deputy Patzer hit his head on the air-conditioner; whether Deputy Patzer warned Day that he was about to shoot him; and whether the conditions were such that a reasonable officer would have feared for his life. As to the last question, the court looks at the totality of the circumstances.  As to the first three questions, the actual amount of injury inflicted and whether Deputy Patzer was hit by

**United States District Court**

For the Northern District of California

Day or ran into the air-conditioner are minor considerations in the totality of what transpired in the short amount of time that Deputy Patzer pursued Day and he and Day were in the darkness of the side yard.

What is significant is that Deputy Patzer had no way of knowing whether Day was armed, or whether one of his friends had escaped from the car.  He also could not see Day, except in silhouette, and had no way of knowing whether he was trying to kill him.  All he knew is that he was being attacked.  The entire incident happened very quickly – the total time from the time the deputies pulled up behind the Mustang until Deputy Patzer shot Day was less than two minutes.

Under the circumstances, the fact that Day turned out not to be armed, and the fact that he did not try to grab Deputy Patzer's weapon, do not control whether Deputy Patzer's actions were objectively reasonable.  Deputy Patzer was faced with a sudden threat, and had to react quickly.  He could not see clearly, and knew only that he was being attacked.  He did not shoot Day in the back.  Day was shot while facing Deputy Patzer, and while in the process of repeatedly attacking him.  Deputy Patzer fired only one shot, just what was necessary to stop the attack on him.

Plaintiff has provided no admissible evidence sufficient to create a triable issue.  For example, although he speculates that Deputy Patzer's scrapes or injuries may have come from running through the bushes or falling on the debris, as opposed to the violence inflicted by Day, he provides no evidence to support that conjecture.  Similarly, while plaintiff speculates that Patzer hit his head on the air-conditioner, the only evidence of that is the declarations of Henry and Sonja Martin, who were not eye-witnesses, who were inside a house across the way with a television on, who are not experts but who nonetheless took it upon themselves to "investigate" the area to decide what had happened, and who formed an opinion as to what "might" have happened based solely on speculation.

Plaintiff's attempt to rely on his "police practices" expert Roger Clark to support the general argument that the use of deadly force was objectively unreasonable is also to no

United States District Court

For the Northern District of California

1    avail.  The gist of Mr. Clark's opinion is that Deputy Patzer's life was not threatened, that

2    his fear was imaginary or subjective, and that he acted improperly in giving chase by

3    himself.  While Mr. Clark is arguably qualified as an expert in police practices, the court

4    gives little weight to his opinions because of their speculative nature.  Nor can Mr. Clark's

5    opinions be used to establish ultimate issues such as whether Deputy Patzer's use of

6    force was objectively reasonable or whether Deputy Patzer violated Day's constitutional

7    rights.

8         Even were the court to find some triable issues as to the question whether the use of

9    deadly force was constitutional, Deputy Patzer would be entitled to qualified immunity

10   because any mistake regarding the need for deadly force was reasonable under the tense,

11   uncertain, and swift-moving circumstances with which he was presented.  Moreover, the

12   right to be free from deadly force under the circumstances presented by this case is not

13   clearly established – that is, a reasonable officer would not necessarily understand that his

14   conduct was unlawful under the circumstances.

15        Ninth Circuit cases applying this test range from cases finding that deadly force was

16   not justified, such as Adams v. Speers, 473 F.3d 989, 994 (9th Cir. 2007) (officer shot

17   unarmed, non-dangerous motorist to prevent his flight but did not warn him to stop and

18   there was no danger to the shooter or others); to cases finding that deadly force was

19   justified, such as Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002) (suspect violently

20   resisted arrest, physically attacked officer, and grabbed officer's gun).  As the cases move

21   from the no-threat-from-suspect scenario to the significant-threat-from-suspect, there is a

22   middle ground described in Saucier as the "hazy border between excessive and acceptable

23   force."  Saucier, 533 U.S. at 206 (citation omitted); see also Brosseau, 543 U.S. at 210.

24   Defendants argue, and the court agrees, that this case falls in that area.

25        2.    Whether Deputy Patzer's use of deadly force violated plaintiff's right to

26              maintain a parental relationship

27        Defendants argue that Deputy Patzer's use of deadly force did not violate plaintiff's

28   Fourteenth Amendment right to maintain a parental relationship.  The Ninth Circuit

21

United States District Court
For the Northern District of California

recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child.  See Porter v. Osborn, __ F.3d __,  2008 WL 4614334 at *5 (9th Cir., Oct. 20, 2008); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

Defendants contend that because plaintiff's second cause of action for loss of the society and companionship of the decedent is predicated and entwined with plaintiff's first cause of action for violation of Day's Fourth Amendment right to be free from excessive force, plaintiff can prevail on his Fourteenth Amendment claim only if there was in fact a violation of Day's constitutional rights.  Defendants argue that because Deputy Patzer's actions did not violate Day's Fourth Amendment rights, summary judgment must also be granted as to plaintiff's second cause of action.

In opposition, plaintiff argues that the motion for summary judgment on the second cause of action must be denied, because triable issues exist regarding this claim, as plaintiff argued with regard to the first cause of action.

The court finds that the motion must be GRANTED.  Whether Deputy Patzer committed a constitutional violation under the first step of the qualified immunity analysis presents two issues.  First, the court must decide the appropriate standard of culpability to apply to Deputy Patzer's conduct to determine whether it "shocks the conscience" under the Fourteenth Amendment's Due Process Clause.  See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  Second, the court must determine whether Deputy Patzer's conduct met that standard of culpability.  See Porter, 2008 WL 4614334 at *5.

When a police officer is faced with a set of circumstances evolving over a short time period, necessitating "fast action" and presenting "obligations that tend to tug against each other," the court applies the "purpose to harm" standard in a claim under the due process right of familial association, rather than the "deliberate indifference" standard.  Id., 2008 WL 4614334 at *7.  Here, plaintiff has provided no evidence sufficient to establish that Deputy Patzer acted with a "purpose to harm" Steffan Day.  In addition, the court has already determined that Deputy Patzer did not violate Day's constitutional rights.

United States District Court

For the Northern District of California

3.      Whether plaintiff can demonstrate any Monell-related claims.

Defendants contend that plaintiff cannot demonstrate a Monell-related claim, as alleged in his third cause of action.  Local governments are "persons" subject to liability under § 1983 when an official policy or custom causes a constitutional tort.  Monell v. New York Dep't of Social Servs., 436 U.S. 658, 690-91 (1978).  To prevail on a § 1983 claim against a municipality, a plaintiff must show that he possessed a constitutional right of which he was deprived, that the municipality had a policy, that this policy amounted to deliberate indifference to the plaintiff's constitutional rights, and that the policy was the moving force behind the constitutional deprivation.  Plumeau v. School Dist. No. 40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

A local government may be liable for constitutional violations resulting from its failure to supervise, monitor, or train, but only where the inadequacy of said supervision, monitoring, or training amounts to deliberate indifference to the rights of the people with whom the local government comes into contact.  City of Canton v. Harris, 489 U.S. 378, 388 (1989); Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996).

Municipal liability based on alleged unconstitutional acts of employees cannot be based on respondeat superior, but rather requires proof that the harm was caused by the policy or custom of the municipality.  Monell, 436 U.S. at 694.  While the liability of municipalities does not depend on the liability of individual officers, it is contingent on a violation of constitutional rights, which means that in the absence of an underlying constitutional violation, there can be no municipal liability.  Scott, 39 F.3d at 916.

Here, defendants argue, as Deputy Patzer did not violate Day's constitutional rights, neither Sheriff Rupf nor the County of Contra Costa can be liable under 42 U.S.C. § 1983.  See Forrett v. Richardson, 112 F.3d 416, 421 (9th Cir. 1997) (no Monell liability where individual officers inflicted no constitutional harm); Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996) (same)).

In addition, defendants assert, even if plaintiff can demonstrate a constitutional violation, there is no evidence that either the Sheriff or the County had a policy of using

23

United States District Court

For the Northern District of California

1   excessive and/or deadly force, and no evidence that the County had been involved in a

2   significant number of deadly force shootings prior to this incident.  Nor, defendants

3   contend, is there any evidence that the County failed to train Deputy Patzer to the extent

4   that such failure amounts to deliberate indifference to the rights of persons with whom the

5   Sheriff's deputies come into contact.  Thus, defendants contend, summary judgment must

6   be granted as to any claims asserted against Sheriff Rupf and the County.

7       In opposition, plaintiff argues that he has viable Monell claims based on the County's

8   "ratification" of Deputy Patzer's unconstitutional conduct, and its "failure to train."  Plaintiff

9   claims that there is substantial evidence that could support a finding that Deputy Patzer

10  violated Day's Fourth Amendment right to be free from an unlawful seizure committed by

11  the objectively unreasonable use of deadly force.  Plaintiff claims that by exonerating

12  Deputy Patzer, the County "signaled" to its deputies that a policy was in place that

13  permitted the use of deadly force even in the absence of a serious threat of physical harm

14  or death.

15      Plaintiff claims that the excerpts from interviews of Deputy Patzer make clear that he

16  "may well have" sustained the injury to his head by hitting the air conditioner.  In addition,

17  plaintiff asserts, when Patzer backed into the air conditioner and mistakenly assumed there

18  was someone behind him, he unreasonably believed he was surrounded and immediately

19  shot Day.  Nevertheless, plaintiff contends, despite possessing this information, the County

20  exonerated Deputy Patzer, and may therefore be liable under Monell.

21      Plaintiff contends that the County may also be liable for failure to train.  Plaintiff

22  claims that the existence of written policies and a training program does not mean that the

23  training was necessarily adequate.  Plaintiff argues that Mr. Clark's declaration establishes

24  that Deputy Patzer acted recklessly in disregarding his training and in pursing Day without

25  backup.  Plaintiff claims that only a jury may decide whether the County had a policy of

26  permitting the unreasonable use of force, and the motion should therefore be denied.

27      The court finds that the motion must be GRANTED.  Plaintiff has provided no

28  evidence of any custom or policy of the County that led to the alleged constitutional

United States District Court

For the Northern District of California

violation.  In particular, while plaintiff claims that Sheriff Rupf failed to discipline Deputy

Patzer for his actions, plaintiff provides no evidence of the County's response to the

shooting incident – which, as defendants assert, is an obvious prerequisite for this

argument.  Moreover, neither Sheriff Rupf nor the County can be liable under § 1983 in the

absence of an underlying constitutional violation.  Scott, 39 F.3d at 916

    4.      Whether summary judgment must be granted as to the state law claims

    Defendant's final argument is that summary judgment must be granted as to the

fourth and fifth causes of action – the state law claims – because Deputy Patzer acted in

conformance with the Fourth Amendment.  Defendants assert that the claims for wrongful

death and civil rights violations must be judged per the "objective reasonableness"

standard.  Defendants contend that for the reasons stated in the discussion of qualified

immunity, above, Deputy Patzer was entitled to use deadly force to protect himself from

Day's attacks.

    In opposition, plaintiff concedes that the state law claims are governed by the

"objective reasonableness" test.  Plaintiff asserts, however, that because issues of fact

preclude summary judgment of the § 1983 claims, summary judgment may not be granted

on the state law claims.

    The court finds that the motion must be GRANTED.  The "objective reasonableness"

standard of Graham applies not only in the Fourth Amendment claim, but also to the state

law wrongful death claims.  See Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1273-74

(1998); Martinez v. County of Los Angeles, 47 Cal. App. 4th 334, 343-44 (1996).  Because

Deputy Patzer acted in conformance with the Fourth Amendment, the state law claims also

fail.[1]

C.    Defendants' Objections and Motion to Strike Evidence

    Finally, the court addresses defendants' objections to evidence and motion to strike

---

[1] The court finds it unnecessary to address defendants' second argument regarding the state law claims – that Deputy Patzer and the County are entitled to immunity under provisions of the California Government Code.

United States District Court

For the Northern District of California

1   plaintiff's evidence.  First, defendants object generally to references to the possibility that

2   Deputy Patzer was not hit on the head by Steffan Day, but rather hit his head on the air-

3   conditioner that extended outward from the window into the darkened yard.  They also seek

4   an order striking evidence that includes such references.  In particular, defendants object to

5   the admission of Exhibits 4, 5, 6, and 7 to the Declaration of Thom Seaton.

6       Defendants assert that Exhibits 4, 5, 6, and 7 are not properly authenticated, as

7   Seaton has no personal knowledge of them, and plaintiff has not laid a proper foundation.

8   Defendants also contend that the evidence is hearsay (or double hearsay) that does not fall

9   within any of the hearsay exceptions in the Federal Rules of Evidence.  With regard to

10  Exhibits 4 and 6, defendants also object on the basis that the original tapes have not been

11  provided to the court for evaluation.  They assert that the trustworthiness and accuracy of

12  the transcriptions has not been demonstrated or verified by plaintiff.

13      In opposition, plaintiff asserts that Exhibits 4, 5, 6, and 7 were obtained from

14  defendants, and that the evidence is admissible under the hearsay exception for

15  admissions.

16      The question whether Day hit Deputy Patzer in the head as Deputy Patzer rose to

17  his feet after falling through the gate into the yard on the side of 26 Galleon Way, as Deputy

18  Patzer states in his declaration, or whether Deputy Patzer in fact hit his head on the air

19  conditioner, is not determinative of whether Deputy Patzer committed a constitutional

20  violation, for the reasons stated above.  Accordingly, as the court has not relied on this

21  evidence in ruling on the motion, the objections are OVERRULED.

22      Second, defendants object to the admission of evidence referencing the contention

23  that Deputy Patzer may have suffered injuries from impact with the bushes as he ran

24  alongside the house, or impact with the debris in the side yard.  However, the parties have

25  neither produced evidence that Deputy Patzer was injured by something other than the

26  attacks by the decedent, nor evidence that it was only the attacks that caused his scrapes

27  and abrasions.  The objection is OVERRULED.

28      Third, defendants object to the admission into evidence of the Declaration of Archie

United States District Court

For the Northern District of California

1    Gore and Exhibit 1 thereto.  Mr. Gore is a private investigator who was hired by plaintiff's

2    counsel to conduct an investigation into the incident that resulted in the death of Steffen

3    Day.  Exhibit 1 to Mr. Gore's declaration is a diagram of the outside area of 26 Galleon

4    Way, which Gore states that he prepared.  The declaration contains no other information.

5        Defendants assert that plaintiff has not properly authenticated or laid a foundation for

6    such evidence, as there has been no showing that Gore visited the site of the shooting, or if

7    he did, when such visit occurred, whether the site was in the same condition as it was on

8    the night of the shooting incident, and whether Gore relied on police diagrams in preparing

9    his sketch.

10        Defendants also assert that Gore is improperly offering opinion testimony as a lay

11    witness, in violation of Federal Rule of Evidence 701; and contend that Gore's

12    representations are not rationally based on his perceptions, not helpful to a clear

13    understanding of his testimony or of a fact in issue, and not based on scientific, technical,

14    or other specialized knowledge within the scope of Federal Rule of Evidence 702.  They

15    also assert that such evidence is hearsay, as plaintiff is offering the document for the truth

16    of the matter asserted (that the site conditions and measurements are as represented by

17    the hired consultant), and that this hearsay does not fall within any of the hearsay

18    exceptions.

19        In opposition, plaintiff contends that Exhibit 1 to the Gore Declaration is fully

20    consistent with the Criminalistics report prepared by the Sheriff's office and produced by

21    defendants, and is also consistent with the photographs of the yard.  He claims that it more

22    than meets the low threshold that a party must meet in order to authenticate a document.

23        The objection is SUSTAINED.  The declaration says nothing about when Gore

24    prepared the diagram, under what circumstances, and based on what information.  It is

25    irrelevant for purposes of this motion that the diagram is "consistent with" other evidence.

26        Fourth, defendants object to the admission of the declarations of Henry Martin and

27    Sonja Martin, on the basis that this evidence was not disclosed to defendants in discovery,

28    and that in fact, plaintiffs represented in discovery that the "neighbors did not see or hear

27

United States District Court

For the Northern District of California

1   any fights between Patzer and the decedent."  Defendants claim that plaintiff is now trying

2   to "improperly sandbag" defendants with these "manufactured and speculative

3   declarations."

4          Defendants also assert that neither Henry nor Sonja Martin is competent to make

5   the representations that they make in their declarations, as they did not witness the

6   shooting incident and therefore lack sufficient personal knowledge.  In addition, defendants

7   contend that plaintiff has not laid a proper foundation that either Henry or Sonja Martin

8   knows what it sounds like when someone runs into an air conditioner; that Henry and Sonja

9   Martin are improperly offering lay witness opinions, in violation of Federal Rule of Evidence

10  701; that their testimony does not qualify under Federal Rule of Evidence 702; that the

11  evidence is hearsay that is not admissible under one of the hearsay objections; that the

12  evidence is not properly authenticated; and that the evidence is based on pure speculation

13  and guesswork.

14         In opposition, plaintiff contends that defendants knew about the Martins because the

15  Martins contacted the police to relay their conclusions about the noises they had heard.

16  Thus, he asserts, defendants have known these facts since August 2006.  Plaintiff

17  contends that under Federal Rule of Evidence 602, testimony should not be excluded

18  unless no reasonable juror could believe that the witness had the opportunity and the ability

19  to perceive the event he testifies about.  Plaintiff argues that the question whether a party

20  has met the burden under Rule 602 is primarily one for the jury to decide.  He contends that

21  the Martins' conclusions following their "inspection" of the site were rational inferences

22  based on the hearing of the sounds following the shooting, and the examination of the

23  scene.

24         The objections are SUSTAINED.  The Martins did not witness the shooting incident,

25  and their opinions regarding the source of the noises they may or may not have heard are

26  therefore entirely speculative.

27         Fifth, defendants seek to strike the Declaration of Roger Clark, as well as the

28  exhibits thereto.  As an initial matter, defendants assert that Mr. Clark's testimony should

United States District Court

For the Northern District of California

be excluded because plaintiff has not established that Mr. Clark is qualified as an expert in the field of "police procedures." They claim that he does not have the proper knowledge, skill or experience to qualify as such an expert. The court finds that this objection should be OVERRULED. Mr. Clark's CV and Rule 26 report establish that he is generally qualified to testify as to police procedures. The court does not find the lack of published books or other materials to be significant.

Defendants' second argument – that many of Mr. Clark's opinions are inadmissible because they are speculative or improperly based on legal conclusions – is more persuasive. Defendants cite numerous statements, arguing that the cited statements relate to what amounts to guesswork by Mr. Clark about things that could or could not have occurred in relation to the incident, or in relation to the future, all of which are total speculation.

For example, defendants assert that Mr. Clark guesses about whether Day posed a future risk of harm to anyone; predicts (without any basis) that the foot pursuit of Day carried with it the strong probability that serious physical harm or death would result to Day; speculates (without any showing of medical training or expertise) that Deputy Patzer did not sustain any serious physical harm, and was not under threat of physical harm or death at the time of the shooting; holds himself out as a sleep-deprivation expert and medical expert when he opines about the effect of loss of sleep on Deputy Patzer, in particular, on the effect on actions that he never witnessed; speculates about the positions of Patzer and Day, and then tries to guess that Day would have had to run in a particular direction in order to flee; speculates about which event "appears" to have precipitated the shooting, even though he was not present, and even though this speculation is contradicted by Patzer's version of events; and attempts to render medical opinions and to offer opinions about how Patzer's injuries "likely" occurred.

In opposition, plaintiff contends that Mr. Clark's testimony is based on his experience and the evidence and therefore is not speculative. Plaintiff contends that because Mr. Clark has police experience and has supervised numerous "apprehensions," he is qualified

United States District Court

For the Northern District of California

to state that had Deputy Patzer followed proper police procedure, Day would not have been killed. He argues that because defendants' justification for the use of deadly force was the harm that Patzer sustained, it is not speculative for Mr. Clark to opine that Patzer did not sustain any harm.

Plaintiff also asserts that because Patzer testified that he shot Day after backing into the air conditioner, it is not speculative for Mr. Clark to testify that Patzer was acting from a subjective fear, not an objectively reasonable fear of death or serious physical harm. He contends that Mr. Clark has experience supervising other law enforcement officers, and so is not speculating when he comments on the effect of Patzer's alleged lack of sleep. He also argues that as an expert reviewing the totality of the circumstances, Mr. Clark is qualified to rely on the photographs of Deputy Patzer in concluding that he used deadly force in response to a subjective fear and not to objective factors.

Plaintiff claims that Mr. Clark's conclusion that Day would have had to run past Deputy Patzer in order to flee through the gate is consistent with evidence in the Criminalistics report produced by defendants, with the photographs of the scene, and with Deputy Patzer's testimony at the administrative review, and is therefore not speculative. Plaintiff contends that this refutes defendants' contention that Deputy Patzer was allowing Day to flee.

Plaintiff argues that Mr. Clark's opinion that Deputy Patzer shot Day based on his unsupported belief that he was being attacked by Day's confederates is based on Deputy Patzer's own testimony and must be viewed withing the totality of the circumstances. Plaintiff claims that the lack of serious physical harm coupled with Deputy Patzer's "baseless" belief that he had been attacked from behind support Clark's opinion that the shooting was based solely on the deputy's subjective fear.

Plaintiff asserts that Mr. Clark's opinion regarding the source of Patzer's injuries is based on the record, not speculation. Plaintiff notes that the evidence shows that Deputy Patzer chased Day through the bushes and over a fence, and that Deputy Patzer fell through the gate and slipped in the trash and debris and put his hand in the debris. In

United States District Court

For the Northern District of California

1   addition, plaintiff claims that the evidence shows that apart from the initial blow to the head,

2   Deputy Patzer suffered only glancing blows because he was able to duck and move.

3   Plaintiff contends that Mr. Clark could also rely on Sgt. Clark's testimony that Deputy Patzer

4   told Sgt. Clark that he had hit his head on the air conditioner.

5        Defendants also assert that Mr. Clark offers numerous opinions regarding liability

6   and/or offers legal conclusions that should be stricken.  For example, defendants assert,

7   Mr. Clark claims that Deputy Patzer made a "fatal error" in deciding to pursue Day alone on

8   a night that Patzer had described as "very dark;" that Deputy Patzer's decision to pursue

9   Day can only be viewed as deliberately reckless and dangerous, and an act directly

10  connected to the shooting death of Day; that Deputy Patzer's use of deadly force was

11  completely unjustified and objectively unreasonable; that evidence that Deputy Patzer may

12  have struck his head on the air conditioner makes his use of deadly force even more

13  unreasonable and unsupportable; and that any fear that Deputy Patzer possessed cannot

14  be considered objectively reasonable justifying the use of deadly force.

15       Defendants argue that these statements constitute improper attempts to use expert

16  testimony to establish the ultimate issues in the case, as they are attempts to establish that

17  Patzer violated the legal standard set forth in Graham v. Connor and/or attempts to

18  establish causation.  They also note that these statements are particularly surprising given

19  that Mr. Clark testified in his deposition that he was not qualified to offer an opinion as to

20  whether Patzer's actions were constitutional.

21       In opposition, plaintiff asserts that Mr. Clark's opinion that Patzer committed a "fatal

22  error" which was deliberately reckless and directly connected to the shooting of Day does

23  not tell the jury what result to reach.  They claim that as an expert on police procedures, Mr.

24  Clark is qualified to present the admissible opinion that Deputy Patzer acted recklessly in

25  pursuing Day.  Plaintiff appears to concede that Mr. Clark is not permitted to proffer an

26  opinion regarding whether the shooting was objectively unreasonable.  Nevertheless,

27  plaintiff argues that Mr. Clark should be permitted to state that the shooting would not have

28  been justified even if Day had punched Patzer in the head.

31

United States District Court

For the Northern District of California

1    Plaintiff claims that defendants' arguments run counter to the use of police

2 procedures expert testimony recognized in several cases; and asserts that if he is not

3 permitted to use this testimony, the court will essentially be relying only on the self-serving

4 testimony of Deputy Patzer.

5    Defendants' final argument is that even if Mr. Clark's opinions are accepted, they do

6 not demonstrate the existence of any genuine material factual dispute as to any alleged

7 constitutional violation.  They contend that Mr. Clark's opinions amount to testimony that

8 Deputy Patzer used bad or negligent tactics that led directly to the shooting of Day.

9    Thus, defendants argue, Mr. Clark's testimony regarding Deputy Patzer's alleged

10 "fatal error" in following Day by himself away from the patrol car, and Deputy Patzer's

11 alleged error in failing to notify dispatch of the situation or to call in other units before

12 attempting to pursue Day, or to fail to use other, less lethal methods during the struggle,

13 are all irrelevant to the question whether his use of deadly force was objectively

14 reasonable.  They contend that such criticisms are essentially based on masked 20/20

15 hindsight, which Graham has held is to be ignored.

16    In opposition, plaintiff argues that Mr. Clark's declaration and report raise "serious

17 issues" about Deputy Patzer's conduct. Mr. Clark notes that Day was 17 years old, that

18 Deputy Patzer had no information that Day had committed any crime, that Deputy Patzer

19 had access to other, non-lethal, enforcement tools but made no attempt to use them, and

20 that Day inflicted no serious harm on Deputy Patzer.  Plaintiff claims that these admissible

21 opinions would support a jury's finding that Deputy Patzer's use of deadly force was

22 unreasonable.

23    The objections are largely SUSTAINED.  The court agrees with defendants that

24 much of Mr. Clark's opinion is speculative, and goes beyond the scope of his expertise.  He

25 is not a medical expert, and so is not qualified to testify as to the seriousness of Deputy

26 Patzer's injuries.  He is not a psychiatrist, and is not qualified to testify as to whether

27 Deputy Patzer's fear was rational or not.  He was not an eye-witness, so he cannot say

28 what happened during the incident.

United States District Court

For the Northern District of California

1   Moreover, the testimony regarding legal conclusions is improper.  While "testimony

2   in the form of an opinion or inference otherwise admissible is not objectionable because it

3   embraces an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704, an expert

4   witness cannot give an opinion as to his legal conclusion – that is, an opinion on an ultimate

5   issue of law.  Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1017 (9th Cir.

6   2004).

7   Nor does the fact that an expert disagrees with an officer's actions mean that the

8   officer's actions were unconstitutional.  Billington, 292 F.3d at 1189.  A plaintiff cannot avoid

9   summary judgment simply by producing an expert's report that an officer's conduct leading

10  up to a deadly confrontation was imprudent, inappropriate, or even reckless.  See id.

11  Rather, the court must decide as a matter of law whether the officer's conduct was

12  objectively reasonable.

13  In addition, plaintiff cannot establish a Fourth Amendment violation simply by

14  proffering an expert opinion to the effect that Deputy Patzer committed negligent acts or

15  used unwise tactics, as negligent acts do not incur constitutional liability.  Id. at 1190.  Even

16  if an officer intentionally or recklessly provokes a violent confrontation or response, that

17  does not transform the incident into a constitutional violation unless the provocation was in

18  itself an independent constitutional violation.  Id. at 1190-01.

19  **CONCLUSION**

20  In accordance with the foregoing, the court finds that defendants' motion for

21  summary judgment must be GRANTED.

22

23  **IT IS SO ORDERED.**

24  Dated: November 10, 2008.

25  _____
    PHYLLIS J. HAMILTON

26  United States District Judge

27

28

33